AUSTIN SIMS *v.* THE STATE.

1. MURDER — THREATS — EVIDENCE. — If the defence to an indictment for murder is based upon threats previously made against the life of the accused by the deceased, evidence of such threats is admissible, but shall not be regarded as affording a justification, unless it be shown that at the time of the homicide the deceased manifested, by some act, a present intention to execute the threats so made.

2. SAME. — Under such circumstances, the general character of the deceased is a proper subject of inquiry, to the extent as to whether or not he was a person of violent and dangerous character, or of a kind and inoffensive disposition, and such a person as might or might not be reasonably expected to execute threats previously made.

3. SAME—CHARGE OF THE COURT. — It is a well-settled principle of law that the accused, after having been apprised of threats against his life by the deceased, and if at the time of the homicide the deceased, by any act, manifests an intention to execute his threats, is authorized to act upon appearances in resorting to any means to protect himself, and a killing under such circumstances would be justifiable homicide. A charge under circumstances of this character is deficient unless it presents this principle of the law. See the opinion *in extenso* on the subject.

4. SAME. — The trial court is required, in felony cases, to instruct the jury as to the law applicable to every legitimate view they might take of the evidence adduced on the trial.

APPEAL from McLennan County. Tried below before the Hon. L. C. ALEXANDER.

The indictment charged the appellant with the murder of James Mellon, in McLennan County, Texas, on the twenty-ninth day of September, 1877. The trial, at the May term, 1879, resulted in a verdict of guilty of murder in the second degree, and the punishment was assessed at thirty-five years in the penitentiary.

Mrs. Charles Willis, for the State, testified that on the Sunday morning of the killing she saw two men riding towards her house from the direction of Dudley Hansford's place, one man in shirt-sleeves riding slowly ahead, and the other wearing a coat and riding in a gallop. When the man in the coat overtook the other, the two stopped, and appeared to be talking, but witness heard nothing said. Witness left the door and went back into the house, leaving the two men standing near each other in the road. Shortly the witness heard angry words, and returned to the door, and found the two men near each other in the road. When first seen they were, perhaps, three hundred yards distant from witness, and were now perhaps forty yards distant. Witness heard the man in his shirt-sleeves halloo to the other man, " You're a G—d d—d thief ; you have stolen my money," or, " just stolen my money." Presently the man wearing a coat wheeled, with his pistol presented, and advanced quickly upon the other, who retreated towards

witness's house. They continued to run, the pursuer gaining upon the pursued. When near the house of witness, the pursued said, "Aus, don't shoot; I have nothing to hurt you with." When the pursued party was about thirty feet distant, the pursuing party fired, and the party pursued leaned forward on his saddle. At this juncture the witness left the door, and returned in a short time. When witness returned the pursued party was down off his horse on the ground, inside her cow-lot, staggering towards some stacks. The pursuer (the defendant) was evidently trying to get another shot at the pursued, who meanwhile sheltered behind the stacks. The appellant then rode up to the bars and tried to let them down. He dismounted, let the bars down, rode up to where the deceased had fallen, and fired into his body twice, then rode off. Austin Sims was the man who did the shooting.

The evidence for the prosecution is substantially presented in the testimony of this witness. Others for the State were introduced, but it was detailed by them pretty much as given above.

Mrs. Mary Hansford, sister of the appellant, testified that she knew the deceased well. He came to her house on the Saturday before he was killed (on Sunday), and, inquiring for the appellant, said he intended to kill him. He stayed around the house and yard from noon until night that day. He returned early next day, and remained until the witness left to attend the funeral of her husband, who was buried that day. On the same day, while witness was sitting at the window, she heard the deceased say he intended to kill the appellant. Wallace and Rainville were present. Rainville, or "Frenchy," as he was known, is now dead; he was killed shortly after the killing of the deceased. Wallace is in Bowie County. Witness has heard that defendant has been told of deceased's threats, made on the day before the killing. Mellon, the deceased, was a large, powerful man.

Elisha Sims, appellant's father, testifying for the defence, stated that, on the Friday night before the Sunday on which deceased was killed, he heard an unusual noise about the premises after he and the family had retired. Looking out into the bright moonlight, he saw a number of mounted men around the house. The spokesman of the party ordered witness to strike a light. Witness had no matches, and called on the party for a supply. When he went out to get them, several pistols were drawn on him, and he was threatened with instant death if any of the party were hurt, and at the same time was assured that he was in no danger if he would obey orders. Witness lit the lamp, and he was forced by the party to carry it from room to room, while several of the party, six or eight in number, searched carefully through every apartment of the house. When through searching the house, they forced witness to go with them to the stable, the granary, and smoke-house, each of which they searched carefully. They said they wanted a man named McMahon. No such man had ever been at the house of witness, nor had witness ever known such a man in the neighborhood. The deceased was with the party. Witness asked him, "Jim, what are you doing here?" to which he responded, "None of your d—d business." Witness recognized no other member of the party. When the party first came in the house, some of them felt of the bed in which witness and James Dignon had been sleeping. One of them said, "We are d—d close to him; his bed is yet warm." When they came to appellant's clothes, he asked whose clothes they were. Witness replied that they belonged to a cotton-picker. One of the party said, "They are d—d good clothes for a cotton-picker." Upon cross-examination, witness testified that deceased was not masked. As the party moved off, witness counted forty-two men.

Mrs. Elisha Sims, wife of the last witness, corroborated his testimony, and added that she told appellant next day of the occurrences of the night before.

*Thomas Harrison* and *J. L. Dyer*, for the appellant. The charge of the court says: "And if a person be not of sedate and deliberate mind, and assail and wound another, and afterwards, when in no danger nor apparent danger from the person assailed, follow him up, and, with a sedate and deliberate mind and formed design to kill or do great bodily injury to him, kill him, such killing is with express malice."

This part of the charge is believed to be erroneous, in failing to state that, after assailing and wounding another, not having at the time a sedate and deliberate mind, there must have elapsed time for the mind of the assailing party to have become cool and self-possessed enough to contemplate the nature of his acts, or to have become possessed of the deliberate character of mind necessary to characterize his conduct with the consequences of murder; and the jury should have been instructed that sufficient time must have elapsed for the mind to have become so formed, taking into consideration all the circumstances at the time, in forming their conclusion as to whether the mind could have become impressed with the deliberate character necessary to constitute murder. The same deliberate character of action is essential to murder in the second degree, and this part of the charge was not corrected by the court afterwards, and was calculated to create an erroneous impression upon the minds of the jury.

The court also charges the jury that, if " defendant did shoot and kill said James Mellon with a weapon calculated to cause death in the manner used, and without legal provocation, excuse, or justification, you will find him guilty of murder in the second degree."

This part of the charge confides to the discretion of the jury a latitude to determine for themselves what was a " legal provocation, excuse, or justification," without defining it by this charge, or without referring them to any other portions of the charge for such definition, and was calcu-

lated to mislead the jury into a belief that they might themselves determine the import and the meaning of the terms " legal provocation," etc. ; and the charge of the court was not restrictive enough for the discretion of the jury, and was prejudicial to defendant.

Again : the court charges the jury that threats furnished no justification to defendant, unless the deceased, at the time of the killing, was doing some act manifesting an intention to put such threats into execution. Here again there is a failure to charge with that ampleness the law requires. The jury by this charge are restricted to the act of deceased then done, manifesting an intention to carry into execution the threats ; confining the jury to the consideration of act and intention of the deceased alone, and forbidding them virtually from a consideration of the fact that the defendant might have acted on the appearances of danger as they appeared to him in his situation and circumstances as he was at the time, though the act may have been such on the part of deceased as would lead the jury to think, on an after-view of the matter (when it might be shown deceased was not conditioned so as to execute the threat, by being armed, etc.), that his act failed to evidence an intention to execute his threat. Men so threatened and imperilled are not in a condition to think as they otherwise would do ; the law does not assume they should ; they assume oftentimes an ability of the party to execute a threat when he does not possess such ability, and act upon belief and appearances of danger ; and when they exercise a prudent caution, they are excused, though the appearances upon which they act turn out false. And the court, in the instruction, made the consideration of the jury turn on the " act " of the deceased, when viewed in the light of after-ascertained facts and circumstances, and failed to allow the jury to consider the acts of the deceased as they at the time might have impressed his belief and appeared to him, and caused him to infer an intention to carry them

into execution; or, in short, failed to confide to the jury those considerations that might have actuated defendant at the time, but confined them to the acts and intentions alone of the deceased, irrespective of apparent danger as it appeared to him, and from which he might reasonably have inferred danger. *Johnson* v. *The State*, 27 Texas, 767; *Irwin* v. *The State*, 43 Texas, 240; *Shorter* v. *The People*, 2 Comst. 193; *Logue* v. *The Commonwealth*, 2 Wright, 265; *Rippy* v. *The State*, 2 Head, 217; *Phelps* v. *The Commonwealth*, 2 Duv. 328; *Pond* v. *The State*, 3 Mich. 150.

The court erred in refusing the charges asked by defendant.

1. The defendant moved the court to instruct the jury that "if they believe the deceased made serious threats against the life of defendant, and defendant had reasonable grounds to believe, and did believe deceased, at the time of the killing, was about to execute his threats against defendant, then defendant had the right to act upon such belief, so far as necessary for his safety, whether the facts evidencing such danger actually existed or not; and such belief may have been based on either the words or acts of deceased." This instruction was by the court refused, for the reason, as stated, that the law applicable to the case had been charged. The charges that had been given by the court are the ones before adverted to; and for the reasons pointed out in the foregoing discussion of said paragraphs of the charge, because the same were not full enough, the said charge asked by defendant should have been given; and for failing to give same there was error.

2. Defendant moved the court to instruct upon the law of manslaughter, which instruction on this point was by the court refused. In view of the evidence as a whole, whereby it is shown that deceased, as a member of a mob, had the night previous to the killing visited defendant's house, which mob had made declarations that clearly tend to evince

the fact that they were after defendant that night; the fact that such was communicated to defendant; and in view of the threat made against defendant's life, and communicated to him, as shown by the evidence of Mrs. Hansford, and the following of defendant by the deceased on the morning of the killing, and the cursing and abuse given defendant by deceased just at the time of the beginning of the diffi-culty — such last conduct was a verbal act, being such as would reasonably tend to engender a belief in defendant's mind that the threats made were about to be executed. All these circumstances combined, and acting upon defendant's mind, were such as would render it incapable of cool reflec-tion, and beget that sudden passion that the killing, while in the transport thereof, would have justified and required a charge upon the law of manslaughter; and because the court refused defendant's charge asked thereon, there was error; and for the foregoing reasons, all of which were embodied in the motion for new trial, we submit that the court erred in overruling defendant's motion for new trial, for which this case should be reversed and remanded

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. There was evidence introduced by the de-fendant to the effect that the deceased, shortly before the killing, had been in search of the defendant; that he had threatened to take the life of the defendant, and that these threats of the deceased to take the life of the defendant were made but a short time before the killing, and had been communicated to the defendant prior to the killing. Under this state of the testimony it became necessary that the court should charge the jury as to the law applicable to a case where the defendant seeks to avail himself of this character of defence. Our statute law on this subject is as follows: " Where a defendant accused of murder seeks to justify himself on the ground of threats against his own

life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offence unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made. In every instance where proof of threats has been made, it shall be competent to introduce evidence of the general character of the deceased. Such evidence shall extend only to an inquiry as to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition, or whether he was such a person as might reasonably be expected to execute a threat made." Rev. Penal Code, art. 608 ; Orig. Penal Code, art. 612.

The most important question in the present case is as to the correctness and sufficiency of the charge of the court on the defence of killing on account of threats against the life of the defendant. On this branch of the subject the charge of the court was as follows :  " 8. Threats by one person to take the life of another are no justification of a homicide committed by the person threatened on the person who made the threats, unless the person who made the threats was, at the time of the killing, doing some act manifesting an intention to put such threats into execution. 9. If you believe from the evidence that Austin Sims did kill James Mellon as alleged, but that said Mellon had previously threatened to take the life of defendant, and was at the time of the killing doing any act manifesting an intention to put such threat into execution, you will find the defendant not guilty." It is urged on the part of the defendant that the charge given by the court was too restrictive in its character ; that it confined the jury to the acts of the deceased at the time of the homicide, and did not allow the defendant to act from appearances as presented to the defendant. For the purpose of correcting the supposed defect in the charge of the court, counsel requested the court to give the jury the following additional instruction : " That if the de-

fendant, at the time of the killing of Mellon, had reasonable grounds to believe, and did believe, that he (Mellon) was about to execute his threats against the defendant, if he made serious threats to take his life, then the defendant had the right under the law to act upon such belief, so far as necessary for his safety, whether the facts evidencing such design actually existed or not ; and such belief may have been based either upon the words or acts of Mellon.'' The question as to the sufficiency of the charge of the court must be tested by the article of the Penal Code set out at length herein.

Our Supreme Court, in *Johnson* v. *The State*, 27 Texas, 757, said that '' the circumstances under which a party who takes the life of another may rely upon threats as an element in his defence is clearly shown by art. 612 of the Penal Code. If, at the time of the homicide, there is any act from which the accused may reasonably infer an intention to carry them into effect, he is justified in resorting to such means as may be then in his power to defend and protect himself against their execution. If death ensues, it is justifiable homicide. But in no case, under the provisions of the Code, or out of it, if we were permitted to look elsewhere to ascertain the law upon the subject, can it be held that mere threats, or threats unaccompanied by some demonstration from which the accused may reasonably infer the intention of their execution by the deceased, either justify such homicide or reduce it from murder to manslaughter.'' The case of Johnson was decided in 1865, Mr. Justice Moore, now chief justice, delivering the opinion of the court. In 1875, some ten years after Johnson's case was decided, our Supreme Court had its attention again called to the same subject, in the case of *Irwin* v. *The State*, 43 Texas, 236. In that case Roberts, C. J., delivered the opinion of the court, and quoted from the opinion in Johnson's case to the same extent as above set out herein, and added an unqualified approval of what was said

in Johnson's case, in the following emphatic language: "This is a clear statement of the established law, however else, or with different phraseology, it may be stated in other opinions of courts or in elementary treatises on criminal law."

Such was the interpretation and application given to the article under consideration, by the Supreme Court, and repeated at long intervening intervals, prior to the organization of this court, and in which we acquiesce. In fact, we are not aware that it has ever been questioned. In placing the article of the Code and the charge of the court in juxtaposition, it is found that the charge instructs the jury, negatively, that threats by one person to take the life of another are no justification of a homicide committed by the person threatened on the person who made the threats, unless the person who made the threats was at the time of the killing doing some act manifesting intention to put such threats into execution. To our minds, this portion of the charge would be free from objection if it had been preceded by an affirmative charge, stating in effect that if, at the time of the homicide, there was any act then done by the deceased from which the defendant might reasonably have inferred an intention to carry out or put into effect the threats, he would be justified in resorting to such means as were then in his power to protect himself against the execution of the threats, and if death ensued it would be justifiable homicide. The omission of the court to give an appropriate affirmative instruction as to what the law permits a defendant to do under the given state of the case as developed by the proofs, to which the jury were required to apply the law, was an error to the defendant's prejudice. And we are of opinion that this defect was not cured by the subsequent portion of the charge. *Johnson* v. *The State*, 43 Texas, 612. In the case under consideration there is no question that the deceased came to his death by the hand of the defendant. It is not our province to intimate that the jury

would have come to a different conclusion under a different charge. We may be permitted, however, to say that the defendant was, at the time of and immediately preceding the killing, surrounded by very peculiar circumstances, and the only defence he had was to justify the killing on the grounds of previous threats against his own life made by the deceased; and hence any feature of the charge which was calculated to deprive him of the full measure of that defence was necessarily prejudicial to his rights before the jury. The jury were not even informed that they were permitted, as in Johnson's case, above referred to, " to take into consideration all the facts and circumstances surrounding the parties at the time of the killing which were given in evidence." The special instruction asked by the defendant, whether strictly applicable or not, was sufficient, in our opinion, to call to the attention of the court what we deem, under the peculiar circumstances surrounding the case as developed by the statement of facts, an important omission in the charge.

The instruction having been requested at the proper time, the judge was not required to give it as asked; but it was his duty to either give or refuse them, with or without modification, agreeably to art. 679 of the Code of Criminal Procedure. In other words, it would have been proper for the court to have given, in appropriate language, a suitable instruction curing the defect in the main charge, his attention having been specially called to the subject. But, whether the requested instruction pointed clearly to the omission in the main charge or not, it was incumbent on the judge to charge the jury and " distinctly set forth the law applicable to the case." Code Cr. Proc., art. 677.

Mr. Bishop (vol. 1, sect. 978, 3d ed.) says: " The charge should simply develop the rules of law governing the particular facts — all the facts, not a part only — which the evidence tends to establish; and it is to be interpreted and judged of, not in an abstract way, but with reference to those

facts.   Hence the same language may be correct or erroneous, according to the facts of which it is spoken " (citing cases from a number of States, our own among them).   What is meant with us is, substantially, that the charge shall instruct the jury as to the law arising from the evidence, and as to every legitimate deduction which the jury may draw from the facts proved on the trial.   *Johnson* v. *The State*, 27 Texas, 758, and previous cases cited in the opinion.   In *Smith* v. *The State*, 7 Texas Ct. App. 414, it was said: "The rule of law is well settled that it is the duty of the judge to instruct the jury as to the law applicable to every legitimate view they might take of the testimony adduced on the trial."   This is precisely what we understand to be required of the judge in criminal trials under the Texas Code, as will be seen by reference to a number of cases.

Other matters are assigned as error, and are discussed by counsel, which we deem it unnecessary to consider here, as they may not arise on another trial.   Matters relating to the charge will of necessity depend upon the testimony as developed hereafter, in the further progress of the case. We are of opinion there was error material to the rights of the defendant as herein indicated, and on account of this error the judgment must be reversed and the cause remanded.

*Reversed and remanded.*