## PRITCHETT vs. THE STATE.

|  |  |
|---|---|
| 22 | 39 |
| 129 | 77 |
| 22 | 39 |
| 143. | 10 |

1 An act performed by a quick, impulsive, blood-thirsty, abandoned man may afford much stronger evidence that the life of the person assailed was in imminent peril, than if performed by one known to possess an entirely different character and disposition, and might very reasonably justify a resort to more prompt measures of self-preservation. In such case, the act and the *status* of the actor must be taken together, in order to arrive at a just conclusion respecting its nature; and thus the character of the deceased may become a legitimate subject of inquiry, as connecting itself with the transaction which it may serve to explain.

2. But however bad and desperate the character of the deceased may have been, and however many threats he may have made, he forfeits no right to his life, until by an actual attempt to execute his threats, or by some act or demonstration at the time of the killing, taken in connection with such character and threats, he induces a reasonable belief on the part of the slayer that it is necessary to deprive him of life in order to save his own, or to prevent some felony upon his person.

3. When a homicide is committed under such circumstances as tend to show that the slayer acted in self-defence, the previous threats of the deceased, and his conduct upon the fatal occasion, construed with reference to his known charac-

Pritchett v. The State.

ter and peculiarities, having relation to such conduct and tending to explain it, all enter into, and form parts of the transaction, and may properly be received in evidence.

ERROR to the Circuit Court of Madison.
Tried before the Hon. JOHN E. MOORE.

D. C. HUMPHREYS, for plaintiff in error.
M. A. BALDWIN, Attorney General, *contra*.

CHILTON, C. J.—The prisoner was indicted in the Circuit Court of Madison county, for the murder of one Henry Stammers. Upon his arraignment he pleaded not guilty; was tried and convicted of murder in the second degree, and sentenced by the court to confinement in the penitentiary for the term of ten years.

The proof conduced to show, that ill feeling had grown up between the deceased and the prisoner, on account of a warrant sued out by the latter against the deceased, before a justice of the peace; that the deceased had made threats of personal violence against the prisoner, which had been communicated to him, and that, on the morning preceding the day when he was killed, the deceased had gone to the field in which the prisoner had been plowing, and, with a pistol in one hand and a rock or stick in the other, had forbid the prisoner's going to his plow; that just before the killing the prisoner was seen starting from his house, priming his gun and picking his flint and crying; that he proceeded to the premises of the deceased, and found him near his home; told him in a loud voice, " stop, I have come to shoot you;" that the deceased stopped and turned round, was fired at by the prisoner, and killed immediately.

The prisoner proved that he was a peaceable, orderly man hitherto; and the same witness who proved the prisoner's good character, was asked by the prisoner's counsel, " if he knew the character of the deceased; whether he was a turbulent and quarrelsome man, or a peaceable and orderly one?" The Circuit Court, on objection of the solicitor, refused to permit the witness to answer this question, and this refusal is the only matter complained of as error.

We are referred by the counsel for the prisoner, to the

case of Quesenberry v. The State, 3 Stew. & Porter 308, as an authority favoring the admission of the proof sought to be elicited by this interrogatory. In that case, while it was admitted, " that the good or bad character of the deceased could have no influence, as an abstract proposition, upon the guilt of the accused," yet, it was said, there might be cases where the killing was attended with such circumstances as rendered its character doubtful, and in which the general character of the accused might sometimes afford a clue to the truth; that it was an acknowledged principle, that, if at the time the deadly blow was inflicted, the prisoner who so inflicted it had well founded reasons to believe himself in imminent peril, without having, by his fault, produced the exigency, such killing would not be murder. The court further says: " If the deceased was known to be quick and deadly in his revenge of imagined insults—was ready to raise a deadly weapon on very slight provocation, or, in the language of the counsel, his " garments were stained with many murders," when the slayer had been menaced by such an one, he could find some excuse in the strongest impulses of our nature, in anticipating the purposes of his antagonist. The language of the law in such case would be, ' obey that impulse to self-preservation, even at the hazard of the life of your adversary.' "

I have quoted thus largely from that case, in order that, upon a principle of law of so much delicacy and importance, this court might avail itself of the occasion to limit and guard the strong expressions employed by the judge who delivered the opinion, and to correct any misapprehension of the law to which it may have given rise. That there may be cases where the known temper and disposition of the deceased, prompting him to cruelty, deadly revenge and recklessness of human life, may be so connected with acts indicating an intention on his part to take the life of the slayer, or to inflict some great bodily harm, as to become a part of the *res gestæ*, and to justify the slayer in resorting to more prompt and energetic measures of self-defence, we do not deny. But whatever may be a man's character for desperation and recklessness, he is entitled to the protection of the law; and it is as much a crime in the eye of the law to slay him, as it is

4

the most peaceable and law-abiding citizen in the community. Yet, the law, having respect to the nature of man, and aiming to arrive at the true intent and motive which characterize acts prohibited by it, allows every fact and circumstance immediately connected with the act, and which tends to elucidate and explain its nature and character, or the motive and intent which moved to its perpetration, to be given in evidence. It endeavors to adjust the measures of defence to the nature of the assault, and in doing this, it permits the party assailed to view the assailant just as he is; for it is chiefly from a knowledge of the true condition of the parties at the time the act is done, that we can arrive at the motives which may reasonably be supposed to have influenced them. Oliver v. The State, 17 Ala. Rep. 598. An act performed by a quick, impulsive, blood-thirsty, abandoned man might afford much stronger evidence that the life of the party assailed was in imminent peril, than if performed by one known to possess an entirely different character and disposition, and might very reasonably justify a resort to more prompt measures of self-preservation. In such case, the act and *status* of the actor must be taken together, in order to arrive at a just conclusion respecting its nature. Thus it is, the character of the deceased may become a legitimate subject of inquiry, as connecting itself with the transaction which it may serve to explain. But however bad or desperate that character may be, and however many threats such person may have made, he forfeits no right to his life, until by an actual attempt to execute his threats, or by some act or demonstration at the time of killing, taken in connection with such character or threats, he induces a reasonable belief on the part of the slayer that it is necessary to deprive him of life in order to save his own, or to prevent some felony upon his person. And when a homicide takes place under such circumstances as tend to show that the slayer acted in self-defence, the previous threats of the deceased, his conduct upon the fatal occasion construed with reference to his known character and peculiarities having relation to such conduct and tending to explain it, all enter into and form parts of the transaction, and may be properly received as evidence.

If the quotation we have made from the case of Quesen-

berry v. The State, goes to support the view taken by the counsel for the prisoner in this case, namely, that because a man of "turbulent and quarrelsome disposition" has threatened to take the life of another, the party menaced may seek him out at his own house and kill him, thus "anticipating his antagonist's purposes in obedience to the impulse of his nature to self-preservation," we should not hesitate to declare that it was not the law; but taking the whole decision together, we do not so understand it. In such case, the character of the deceased is altogether immaterial, as it affords, be it never so bad, no justification or excuse for the killing; and the court should exclude all evidence concerning it. "The rule," says an American author, "undoubtedly is, that the character of the deceased can never be made a matter of controversy, except when involved in the *res gestœ;* for it would be a barbarous thing to allow A. to give as a reason for his killing B., that B.'s disposition was savage and riotous." Wharton's Cr. L. 172; see also State v. Field, 14 Maine Rep. 248; Commonwealth v. York, 7 Law Rep. 507; Wright v. The State, 9 Yerg. 342.

Under the view of the law which we have above expressed, and the circumstances described by the proof in this cause, it is very clear the court did not err in excluding the proof.

The judgment and sentence of conviction must consequently be affirmed.