# COURT OF APPEALS OF TEXAS.

## AUSTIN TERM, 1883.

[No. 2660.]

### JAMES CRESWELL v. THE STATE.

1. PRACTICE — CASE STATED.—Before announcing ready for trial, the defendant asked permission of the court to confer with certain witnesses for the State. The court granted the request, but, upon the suggestion of the county attorney, stated in the hearing of the witnesses, that they were not bound to confer with the defense, nor to disclose their testimony to him or his counsel, unless they wished to do so; whereupon the county attorney, in open court, stated that he advised the witnesses not to confer with the defense, and they refused to do so. The court refused to compel them, and the defense was required to proceed. *Held*, that there is no power in the trial court to compel a witness to disclose to the opposite side, or to any one, what his evidence will be on the trial, and that while the action of the county attorney in this instance may not have been in good taste, it is no ground for reversal.

2. MURDER—EVIDENCE OF GENERAL CHARACTER OF DECEASED is admissible only when it is shown that at the time of the homicide the deceased did some act indicating his purpose then to take the life of the defendant, or do him some serious bodily harm. See the opinion *in extenso* for a state of case wherein it is held that a proper predicate was not laid for the admission of evidence of the general character of the deceased, as a violent and dangerous man.

3. SAME—PRACTICE—EVIDENCE—CASE STATED.—In explanation of his recent purchase of a pistol, and of his possession of the same on the day of the homicide, the defendant proposed to prove that at that time it was the prevailing custom and habit of the people of that county to carry pistols or other deadly weapons about their persons. *Held*, that the court below did not err in excluding the proposed testimony, which related only to the custom of the people in general, and not to his own habit. See the opinion *in extenso* on this question. ·

4. FACT CASE.—See evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Tarrant. Tried below before John Hanna, Esq., Special Judge.

The indictment charged the appellant with the murder of Lem Edwards, in Tarrant county, Texas, on the eighth day of October, 1869. The conviction is for murder in the first degree, with a life term in the penitentiary assessed as punishment.

Ambrose Creswell, an uncle to the defendant, was the first witness presented by the State. He testified that he was now a resident of Coleman county, and had been for the past five or six years. In October, 1869, he lived in Fort Worth, Tarrant county. The witness knew Lem Edwards who, to the best of his recollection, has been dead fourteen years, and is now buried in the Fort Worth graveyard. The witness heard the defendant speak of Edwards before the killing. He claimed that Edwards owed him thirty dollars, and said that unless the money was paid he would kill Edwards. The witness could not state the exact language used by the defendant on that occasion, but it was in substance that he would kill Edwards unless he paid the thirty dollars. The witness told the defendant at that time that, rather than have a difficulty, he, the witness, would pay the money. The defendant replied that it was not the witness who owed it, and that he did not want the money from the witness. This conversation took place between the witness and the defendant in the course of a walk, and no one else was present. It was a few days only before the killing of Edwards, but the witness could not say how long exactly. The witness did not know where the defendant was staying at that time. Defendant was a son-in-law of Edwards, but the witness did not know whether or not he made his home at Edwards's house.

When a small boy the defendant lived with the witness; later he lived with his father, and after that with the cow-boys. The witness could not say how old the defendant was at the time of the killing of Edwards, as the family record had been lost in an overflow. He may have been twenty-one, but the witness did not think he was so old. He had been married to the daughter of Edwards but a short time before the latter was killed. The witness could not now say that he ever saw the defendant after the killing until he saw him in court.

On his cross-examination, the witness stated that he married a daughter of Mr. Lem Edwards, and that his wife was still living, but was not in Fort Worth. The witness spent one night during his attendance upon the present term of court at the house of John Burchard, who married the divorced wife of the defendant. Mrs. Edwards, the widow of the deceased, spent

that night at Burchard's, and the witness had a daughter there whom he had not seen since Christmas, which was the occasion of his going to Burchard's. The conversation between the defendant and the witness referred to in the examination in chief, according to the best of the recollection of the witness, occurred in 1869, some four or five days before the killing of Edwards. The year 1869 preceded reconstruction, the witness stated.

W. D. Conner was the next witness introduced by the State. He testified that he was now a resident of Hamilton county, but that in 1869 he lived on Clear Fork, about two and a half miles above Fort Worth. He then knew the defendant, and knew Lem Edwards at the time he was killed. He saw the defendant a day or two before the killing of Edwards. The witness had a pistol belonging to a man named Columbus Fitzgerald. Fitzgerald had directed him to let the defendant have the pistol if he called for it. The defendant called for it a day or two before the killing of Edwards, and, as directed by Fitzgerald, the witness delivered it to him. The weapon was a large army sized six shooter. The defendant was riding horseback when he came for it, and had an overcoat or blanket rolled up and tied behind his saddle. Several parties were present at the time, and the remark was made that the defendant was going somewhere. The defendant asked about Ambrose Creswell and Edwards, the deceased, and remarked that he supposed they came by as they went to cut hay in the valley on the other side of Clear Fork.

Cross-examined, the witness stated that he was at that time working at his trade as a blacksmith. The pistol described had been left with him by Fitzgerald, who told him that he had traded it to the defendant, and directed him to deliver it to the defendant whenever he should call for it. The defendant called for the pistol one or two days before the killing, and asked if Ambrose Creswell and Edwards had passed, remarking that they were to cut hay across the creek. He made no threats, and did not seem to be in pursuit of the two parties named. It was common for cow-boys in those days to take a coat or blanket with them on trips, but not when merely riding about. The defendant had been a cow-boy, but the witness did not know that he was one then. The witness thought that the defendant was some seventeen or eighteen years old at the time of the killing. He did not remember that he ever saw the defendant after giving him the pistol.

Horse Wims testified, for the State, that he knew the defendant by sight, and so knew him about fifteen years ago. He also knew Lem Edwards, who, according to his recollection, was killed about thirteen years ago. The witness remembered pretty well the time of Edwards's death, and was of impression that he saw the defendant the night before Edwards was killed, in a shop on Weatherford street, where he, the defendant, had a horse shod. The witness and Bailey Johnson did the work. The witness was not absolutely certain, but thought it was on Sunday night, the night before the killing. It was after dark, and the work was done by candle light. The witness tried to get the defendant to postpone the work until Monday morning, but he said that he was going to leave next day, and could not wait. The witness asked him where he was going, and he said that he was "going to hell or heaven, one." According to the best recollection of the witness, the horse was shod all round.

Cross-examined, the witness said that he heard of the killing of Edwards soon after the events narrated—a day or two afterwards. He heard that Edwards was killed on a certain day. He had not heard of the killing at the time the horse was shod. He heard that the killing was done on Monday night, and, though not positive, the witness thought the horse was shod on Sunday night. "I don't know of my own knowledge when Edwards was killed, nor that he was killed on Monday, and I am not certain that I heard that he was killed on Monday. I heard of the killing on the day after it occurred."

Bailey Johnson, for the State, in his examination in chief, corroborated the witness Wims, stating that he did the work while Wims held the horse. The animal was a black or a brown, and was shod all round. The witness did not think the horse had a saddle on at the time. He heard of the killing of Edwards on the next day.

Cross-examined, the witness did not know of his own knowledge whether Edwards was killed before or after he shod the horse, but he heard of it the day after. The witness discussed the case with special State's counsel, but no one else, though he told several parties that he was in attendance upon court as a witness in this case. He told Cass Edwards that he shod a horse for the defendant, but that he did not then know what the defendant was up to. He also told Cass Edwards that the defendant said that he was "going to hell or heaven, one."

William P. Wilburn testified, for the State, that he knew Lem

Edwards in his lifetime. Edwards was killed, according to the recollection of the witness, on the eighth day of October, 1869. The witness saw his body in the valley of the Clear Fork, some six or seven miles above Fort Worth. He reached the body about noon, or shortly afterwards. The deceased was lying on his face. The witness did not touch it at that time, but examined it after the inquest got through, and saw a hole in the back of the deceased's head at its juncture with the neck, and a scarified place on his face, where, presumably, the ball came out. The witness was of opinion that the wound was made with a dragoon six shooter. The wound was inflicted from behind. The witness examined all the available places around and about the vicinity of the body, to see if any one could have fired on the deceased from ambush. There was but one place—a small gulch near by—where one could have been secreted and done the shooting. In this no traces of a person could be found.

The witness found the tracks of two horses on the Clear Fork, about one hundred and fifty yards distant from the body. These tracks indicated that one was a medium and the other an over-sized horse. One was shod, and the other was barefooted. The witness could not tell from a mere inspection of the ground, which was neither very wet nor very dry, how long the one had been shod. Addressing himself to these tracks the witness said: "These tracks came out of the water about four feet apart, angling across the Clear Fork, and turned right down the bank, nearly east, and about four feet apart. The barefooted horse's tracks were in the path, and the shod horse's tracks were on the right of the path, in the grass; and about thirty feet from where Mr. Edwards's body lay, the horses appear to have started into a run. One of the horses kept right down the bank, in the path, to where the body lay. I did not track him beyond that point. The shod horse kept on to the right, and appeared to be running."

Mr. Edwards, the deceased, lay on his face, with one hand under his body. A dragoon pistol, with the cylinder half out of a scabbard attached to a belt, lay on his back. The witness had known the defendant since he was a small boy—for some ten or twelve years. He did not know what defendant's business was at the time of the killing of Edwards, but thought he was living in Fort Worth. He saw nothing of the defendant after the killing of the deceased until a few days before the trial, when he

saw him in the court house. Had known the family of the de-
fendant ever since they came to Texas, twenty odd years ago.

Cross-examined, the witness stated that when he saw the body
it was face downward, with the pistol buckled around the waist,
the cylinder about one-half out of the scabbard. The witness
trailed the horses himself, but found no evidence of any one lying
in ambush. The horse tracks came out of the water side by side,
about four feet apart, and went down the creek together in that
same position to each other for a distance of about one hundred
and fifty yards, to a point about thirty feet from where the body
lay, at which point they appeared to spring apart, one going
one way and the other going the other. They were going from
east to west, and the body lay at a point thirty feet east from
where the horses sprang apart. The tracks of the two horses
appeared to have been made at the same time. The witness ex-
amined the bluff from where the corpse lay, and could see no
sign of either man or horse along the bluff; in fact, a horse
could not have stepped under the bluff within range of that
point. The witness also examined a thicket standing to the
right of the bluff, but found no signs there. It was the recollec-
tion of the witness that the nails in the shoes did not show in
the tracks; and that is the only means by which to tell, by
tracks, whether or not a horse has been freshly shod. Whether
or not nails in a horseshoe will show as distinctly as the shoe
cork, depends upon the condition of the ground. The witness
thought that nails would show if the cork would. The witness
had known the defendant as quite a youth, as a cow-boy, and as
a married man, and had always known him as quiet, peaceable
and inoffensive. In the opinion of the witness, the defendant
was about nineteen years old when Edwards was killed.

On re-direct examination the witness stated that the barefoot
horse tracks seemed to follow the path or hog trail—that is,
traveled in it—and the shod horse traveled along with it in the
grass, and the two were about four feet apart. The witness
could not tell whether the shod horse had shoes all around or
not. The witness saw no stock in the neighborhood of the body.
It was his recollection, however, that there was a horse or
"something" grazing down below, and "right under the bluff,
I suppose some forty feet from the top of the brush, in the edge
of the water, near the creek, there was a hog." The witness
did not go to examine the hog, but from that distance it ap-

peared to have blood about it.    It lay opposite where the horses jumped apart.

Fannie Snaden was the next witness for the State.    She testified that she lived with the family of Lem Edwards at the time he was killed.    Cass Edwards, who had been out west, was living there at the time, as was also the wife of the defendant, but the witness did not know where the defendant was then living himself.    The witness saw the defendant at Edwards's house on the morning of the killing.    No one was in the house at the time but the witness.    The defendant came to the house riding a black horse.    Hitching his horse to the fence, the defendant came into the house, and asked the witness where Cass and Mr. Edwards were going, and the witness told him that they were going to the bottom to cut grass.    Thereupon the defendant left the witness in the kitchen where she was weaving, and went into the house.    She did not know what he did in the house.    In a few moments he left the house and rode off around the fence, "off on the south side from the house and around the field."    It was then just ten o'clock.    He walked his horse off.    He was going south when the witness last saw him, and Edwards was cutting grass west from the house.    The witness did not examine the horse tracks.    Defendant had a roll on his saddle which looked like a blanket.

Cross-examined, the witness stated that she did not know whether or not the defendant had a pistol on this visit to the house.    He did not say what he was going to do—merely asked where Cass and the old man were going.    The defendant's wife was in the garden with her mother, old Mrs. Edwards.    The defendant did not go to the garden.    The witness saw the defendant when he left the house.    He left in a slow walk.    No one besides the witness was in the house at the time.

Cass Edwards, a son of the deceased, was next placed upon the stand by the prosecution.    He testified that he last saw his father alive on the eighth day of October, 1869, about a quarter of a mile north from the house, going east.    The defendant came to the house that morning at about eight or nine o'clock, riding a dark brown or black horse.    The witness was then in the lot getting up his team to go and cut hay, and the deceased was in the same lot saddling his horse.    The defendant was at the house when the witness and the deceased left.    The witness last saw the deceased alive at the point stated, at which point he, the witness, turned off to go where he was cutting hay.    He next

saw the deceased on the bank of the creek, dead, having been shot through the back of the head.

Two days later, the witness made an examination of the adjacent country. He took the track of the defendant's horse at the house, and followed it around to the point where the deceased was killed. The witness could tell the track of the defendant's horse. The corks of the shoes were close together. He knew that horse, and had tracked him before when he and the defendant were out west together. The witness did not know that these were the same shoes worn by the horse when he tracked him out west, but he had known the horse for three or four months on the cattle trail out west, and knew the peculiarity of the track. The witness could not tell why the corks were close together behind, unless it was that the feet were narrow behind. The shoes worn by the horse that day were like those he wore out west. In starting, these tracks went to the right of the field, and crossed the creek. There was a trail on the north of the field, and the defendant came around the field into that trail, and traveled it through the west end of the valley to the place where the deceased was killed. Two days before this happened, the defendant came to the witness and inquired for the deceased and Ambrose Creswell. The witness had never heard the defendant say anything about the deceased. He saw no pistol about the person of the defendant on the occasion referred to. The witness did not see the defendant after the killing, until after his arrest.

The deceased and the witness were both riding horseback that morning, the latter driving a yoke of steers and going to where he had been cutting hay. They traveled along together to a point where they separated, the witness going northeast, and the deceased going east, to go by and feed a large fattening hog he had, which then lay crippled near the creek. The tracks of the two horses described (the deceased's being barefoot) came together about forty or fifty yards from where the deceased was killed. The horse of the deceased had been hitched under the bench (of the bluff) where he dismounted to walk to the hog. No one had been to the body when the witness reached it. The ball entered the back of the head on the right side, and came out on the left side of the face. The witness heard the shot while waiting for the deceased, and going to the upper end of the valley to get a rake, he saw the deceased's horse grazing around. He then went to look for the deceased and found him dead at

the point described, which was near where the hog was. The witness saw where the deceased's horse had been hitched under the second bench, and indications that the deceased had mounted there and rode off to a point near by where two horses had jumped apart, that of the defendant being on the right. The ground indicated that the horses were running like they were excited. Witness caught the deceased's horse and found blood on it. The witness did not again see the defendant until his arrest. He asked about, but did not search for, the defendant.

On his cross-examination, the witness stated that he and the deceased were in the lot yoking oxen and saddling their horses when the defendant rode up to the house on the morning of the killing. In riding to the house, where he dismounted, the defendant passed the witness and deceased within thirty steps of the fence, and, the witness supposed, saw them. The witness said nothing to the deceased about the defendant at that time. At that time Mrs. Edwards, the mother of the witness, and his sister, the defendant's wife, were in the garden. His other sister and an old negro woman were somewhere about the premises. The defendant was at the house when the witness and the deceased left, and had been there but a few moments. Both the deceased and the witness had pistols on their persons. Two days later the witness trailed the defendant's horse from the house around the field to the place of killing. The tracks indicated that he left the house in a fast gait, but the witness could not say whether loping or running. The horse of the defendant did not stop anywhere between the house and the place of the killing. The witness trailed the deceased's horse no further than from where he had been hitched at the second shelf, near where the body was found, to where the horses jumped apart.

"The hog was down next to the water under the bank, in the creek near the water. My father (the deceased) rode up on the hill from the second bench, from where his horse was hitched, into a path near where the horse tracks came together, and then the tracks came on together towards where I was cutting hay. Defendant's horse was shod all round. I know his tracks by the corks of his shoes being close together."

The coroner's jury reached the body late that evening. When the witness found the body it was lying face downwards. The witness did not dismount, but went to town to see about the jury of inquest, and met Wilburn going to the body as he left. The pistol of the deceased was in the scabbard buckled around the

body, and lay rather to the left side, the handle pointing to the right. No one accompanied the witness in his examination of the ground. His mother had been over the ground on foot before he examined it, and his wife went with her as far as the creek. Wilburn told the witness that he had previously examined the ground. It had rained a few days before, and it was easy to trail a horse, especially if he was running. The witness had employed counsel to prosecute this case, had told them what his evidence would be, and had hunted evidence. The defendant was married to the sister of the witness sometime during the year before the killing. The witness was born in 1851, and at the time of the killing was eighteen or nineteen years old.

William Trezvant testified, for the State, that on the morning of the killing of Edwards, he met the defendant riding a black horse, shod all round, going towards Edwards's house. Defendant tried, as he had tried before, to trade horses with the witness. He said that he had some hard riding to do, and wanted the fine horse witness was riding.

Cross-examined, the witness stated that they talked about trading for about three or four minutes. They did not examine the horses except from the saddle as they rode along. This was between eight and nine o'clock. The defendant made no other offer to trade horses than that he said he would like to trade the witness out of his mare.

C. J. Louckx was next introduced by the State, and testified that he was sheriff of Tarrant county in 1869, and remembered the occurrence of Mr. Edwards's death. He summoned the jury of inquest under direction of Mr. Richardson, the justice of the peace. The inquest was completed about dark. The witness, with the jury, found the deceased lying on his face, rather towards his right side, with his head down the creek. He had a dragoon six shooter, in the scabbard, buckled around him on his left side, and a little back. Witness followed the horse tracks back a short distance. Edwards's horse was barefooted, and the witness found the tracks of another horse shod all round. "The horse that was shod all round made a lunge to the right and went off west. I saw no other horses' tracks around there, except where the barefooted horse had been hitched—maybe fifty yards up the creek, and the horses came together when they came up from there. I did not track the horse to see where he came from, but I know he was fresh shod from the nails and the corks." The witness stated further that he hunted for the

defendant for two days and failed to find him, and that he had not seen the defendant since the day before the killing until the Monday before this trial, when he saw him in the court house.

Cross-examined, the witness stated that he noticed nothing peculiar about the tracks of the shod horse except that, from the impression of the corks and nails, he judged that he was fresh shod. The horses got together first on the bench of the creek, and they traveled together side by side. If the defendant was under bond to appear before the district court, the witness had not arrested him. Witness remembered Thurmond. If the defendant cut Thurmond, and was placed under appearance bond by the witness, the witness did not remember it. The residue of the testimony of this witness, on cross-examination, is a mere repetition of that on his examination in chief.

R. H. Tucker, for the State, testified that at present he was deputy sheriff of Tarrant county. He knew the defendant, but did not, of his own knowledge, know where the defendant has been for the last thirteen or fourteen years. During this time the witness has resided in Tarrant county. He does not remember where and when he saw the defendant last until he saw him in Freestone county. The witness went to Freestone county to identify him, and to bring him to Tarrant county. The witness brought the defendant from Fairfield, Freestone county, to Fort Worth, Tarrant county. The witness is the office deputy, and if there is another *capias* against the defendant, he does not know it. Witness had known the defendant all of his life—they were schoolmates.

When the witness got to Fairfield he told the defendant who he was, but did not tell him what he was there for. He only knew the name the defendant was going by from what he was told. The defendant came in answer to the name of Henry Williams. After talking with the defendant a while, the witness told him his business—that he had come for him, James Creswell.

The cross-examination of this witness was barren of any appreciable interest. He stated that, during the conversation spoken of between himself and the defendant, the defendant was in the custody of Mr. Childs, and the witness supposed was under arrest.

Mrs. Elizabeth Edwards, widow of the deceased, was the next witness for the State. Her husband, she testified, was killed on the eighth day of October, 1869. She last saw him alive on that

morning, when he and his son Cass started off to cut hay. The witness and the wife of the defendant were then in the garden. The defendant had been living at the house of the witness for four or five months until about five days before the killing, when he went off, returning on the evening before that event. Witness, defendant's wife, another daughter and the colored woman, Fannie Snadon, were at the house when he returned. It was between three and four o'clock when the defendant came to the house on the evening before the killing, and he remained at the house for a couple of hours. While there, he inquired for the deceased and for Ambrose Creswell. He changed his clothing, and when preparing to do so he pulled out a pistol and laid it on the bed, attempting at the same time to hide it from the witness. His wife asked him where he got the pistol, and he said that it was Columbus Fitzgerald's. The witness did not see the defendant on the day that Edwards was killed.

Just as the witness started back to the house from the garden, she heard the report of a gun or pistol down about the creek. She heard but one report. On that same evening, after the killing, the witness went to the bank of the creek tracing the horse's tracks from the house. The tracks started from the front of the house and went around south and crossed the creek. From the house to the bank of the creek, the distance is about one hundred and fifty or two hundred yards. The killing occurred on Friday, and on the following Sunday the witness resumed the trail of the horse, and followed the tracks to the second bank of the creek, where it appeared that the deceased had tied his horse to a sycamore on the level bank. His body was found at a point not more than fifty yards from this tree. According to the recollection of the witness, the trails of the two horses came together at the sycamore tree. The horse followed by the witness from the house was fresh shod all round.

Cross-examined, the witness repeated positively that the killing occurred on Friday, the eighth day of October, 1869. The deceased was at the house when the defendant was there on the evening before, but said nothing to the defendant, nor did the witness speak to him. Cass Edwards was not there at the time. He, Cass, was not then married. The witness left the house that evening before the defendant did. Witness saw the pistol when he laid it on the bed. It looked like a new pistol. The deceased had always carried a large pistol after he moved to the frontier. The witness started to the garden when the de-

ceased started to saddle his horse to go to the hay ground, and she did not see him when he started. She did not know how long she had been in the garden when she heard the report of the pistol, but the pistol fired at about ten o'clock.

The coroner's jury had adjourned when the witness took the trail of the horse at the house and followed it to the point indicated. She took the trail at the house and followed it until it crossed the creek, going in on the south side. The house was north of the creek and the body was found south of it. After crossing the creek, the trail went around the bottom prairie. The witness, who was on foot, crossed the creek, and followed the trail to where it went up the bank on the south side. The trail then went south, and turned into the edge of the prairie, where it again turned, and went down a path. This trail was the trail of the shod horse. The deceased reached that point from the other side of the field. His trail showed where he hitched his horse. It showed that the trails came together not more than fifty yards from where the body was found. Witness saw where the horses jumped apart, a short distance from where they got together. Witness was prevented from going nearer than fifty yards of the body of her husband. Cass Edwards's wife was with the witness when she trailed the horse on the evening of the killing, but on Sunday the witness trailed the animal alone. The tracks indicated that the horse traveled fast all the way. State closed.

Mr. Wilburn, for the defense, testified as follows: "I have stated I followed the back track of the horse from where the horses jumped apart, to the creek; and it was about one hundred and fifty yards from where they climbed the bank to where they sprang apart; and it is about fifty yards from the edge of the bank to the water. This makes two hundred yards. I have been living in Texas a long time, and think I know how to trail horses, and by the trail I can tell a running from a walking horse. These horses appeared to be walking about four feet apart, until they separated."

L. C. Gregory testified for the defense that the reputation of the defendant, prior and up to the killing, and at the time, was that of a peaceable, law abiding boy. By Wilburn, recalled, the defendant proved that he was a boy at the time of the killing, in the neighborhood of nineteen years old. The deceased was a large man of one hundred and eighty or two hundred

pounds weight. The defendant would weigh possibly one hundred and thirty-five pounds.

Among a large number of grounds assigned, the motion for new trial presented the questions involved in the rulings of this court.

*Ball & McCart,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Willson, Judge. On the eighth day of October, 1869, Lem Edwards was shot and killed in Tarrant county, near his residence. In March, 1877, the defendant was indicted for the murder of said Edwards, and in February, 1883, he was convicted upon said indictment of murder in the first degree, and his punishment assessed at confinement for life in the penitentiary; from which conviction he has appealed to this court.

Numerous errors in the proceedings and judgment have been assigned by defendant's counsel, but we deem it necessary to discuss only a few of them, passing over those not noticed by us with the remark that in our judgment they are unimportant and untenable.

When this case was called for trial in the court below, the State announced ready for trial, and the defendant being called upon to announce stated that he could not safely go to trial until he could have an opportunity to confer with Cass Edwards and Elizabeth Edwards, two of the most important State's witnesses; that he had never had an opportunity, either by himself or counsel, to confer with the said witnesses or either of them, nor did he in any manner know to what facts they would testify in the case, and he therefore requested the court to be allowed to confer with said witnesses himself and by counsel, before announcing ready for trial. Thereupon, the court granted permission to the defendant's counsel and the said witnesses to confer together, but, at the same time, at the instance of counsel for the State, stated in the presence of said witnesses that they need not confer with defendant or his counsel unless they wished so to do, and that the court had no power to compel them in any way to confer or talk about the case to either the defendant or his counsel. Counsel for defendant then requested the witnesses to retire to a room with him and confer and talk with him about their testimony in the case. Counsel for the

State thereupon announced in open court, in hearing of the witnesses, that he advised said witnesses to refuse to converse with defendant or his counsel about the case, and said witnesses did so refuse; and thereupon the defendant demanded of the court to require said witnesses to converse with him and his counsel concerning their knowledge of the case, which requirement the court declined to make, and the defendant was forced to go into trial without conferring with said witnesses; to all of which he at the time excepted, and presents the above facts in a bill of exceptions, and assigns the same as error.

A question of practice is here presented which has not, as we are aware, been settled by the courts of this State. Is it within the power, and is it the duty, of the trial court to compel a witness to disclose to a party to the prosecution what his testimony will be in the case? We are cited by counsel for appellant, in support of the affirmative of this question, to but a single authority, and that is the case of *Yanez* v. *The State*, 20 Texas, 660. In that case, after conviction, the defendant moved for a new trial upon the ground of surprise, the alleged surprise consisting in relying on mistaken information as to what a certain witness would testify, defendant having been informed, not by the witness, but by another person, that said witness would testify to certain facts favorable to defendant, but upon the trial the said witness testified to a different state of facts prejudicial to defendant.

In passing upon this motion for new trial the Supreme Court said: "The surprise might have been avoided by inquiring of the witness himself, before announcing for trial." It is nowhere intimated that the defendant had the legal right to compel the witness to disclose to him what his testimony would be. If a witness should mislead a defendant as to material facts, and testify on the trial materially variant from what he had informed defendant he would testify, and prejudicially to the defendant, in such case the defendant, upon a proper application, might be entitled to a postponement or continuance of the case upon the ground of surprise. (Code of Criminal Procedure, Art. 568.) But there is no provision of law which requires a witness, before he is placed upon the witness stand to testify, to tell the defendant or any one else what his testimony will be; nor is the refusal of a witness to disclose his knowledge of the case made a ground for a postponement or continuance of a case, or for a new trial after conviction.

When witnesses have been placed under the rule, which does not appear to have been done in this case, they are instructed that they are not to converse with each other, or with any other person, about the case, except by permission of the court, etc. (Code Crim. Proc., Art. 666.) This rule is provided to prevent the testimony of one witness from influencing that of another, and to guard against false evidence. Its purpose is not to prevent parties or their counsel from conferring with witnesses about the case in a proper manner, in the discretion and under the direction of the court. This whole matter is placed by the law within the discretion of the trial judge, and great latitude is allowed him in the exercise of it. His action in such matters would not be revised by this court, except it were clearly shown to be an abuse of discretion operating to the injury of the defendant's rights. (*Williams* v. *The State*, 35 Texas, 355; *Roach* v. *The State*, 41 Texas, 261; *Goins* v. *The State*, 41 Texas, 334; *Sherwood* v. *The State*, 42 Texas, 498; *Ham* v. *The State*, 4 Texas Ct. App., 645; *Davis* v. *The State*, 6 Texas Ct. App., 196; *Cordova* v. *The State*, Id., 208; *Shields* v. *The State*, 8 Texas Ct. App., 427; *Jones* v. *The State*, 3 Texas Ct. App., 150; *McMillan* v. *The State*, 7 Texas Ct. App., 142; *Walling* v. *The State*, 7 Texas Ct. App., 625; *Brown* v. *The State*, 3 Texas Ct. App., 294; *Avery* v. *The State*, 10 Texas Ct. App., 199; *Johnson* v. *The State*, Id., 571; *Hoy* v. *The State*, 11 Texas Ct. App., 32.)

While we think that, ordinarily, it would be proper and just to afford to a defendant the opportunity to confer with the witnesses in the case about their knowledge of the facts, and that it would be right for witnesses to fully state to the defendant or his counsel what their testimony would be, still, we know of no rule of law by which witnesses can be compelled so to do. But if such legal right on the part of defendant, to compel the witnesses to disclose their knowledge of the facts of the case was shown to exist, a denial of this right would not be sufficient error to set aside a verdict of conviction, unless it were shown that thereby he had probably been injured in his rights. In the case before us, it is not shown or even intimated that the defendant was in any way injured or prejudiced in the trial of his case, by reason of the refusal of the witnesses to confer with him and his counsel as to what their testimony would be. We conclude that the court below did not err in refusing to require the witnesses to confer with the defendant and his counsel about the case. That the State's counsel advised the witnesses in open

court not to confer with defendant or his counsel, without assigning any reason for such advice, is not error of which the defendant can complain. Such advice may have been in bad taste and improper, but it does not in this case reach the dignity of an error in law.

Upon the trial defendant offered evidence to prove that the general character of the deceased was that he was a violent and dangerous man; that he habitually carried a six shooter upon his person, and was expert in the use of the same. This proposed evidence was excluded, and the action of the court in rejecting it was excepted to at the time, and is assigned as error. There was no predicate laid for the introduction of such evidence. (Penal Code, Art. 612.) It was not proved that deceased had threatened any injury to the defendant, either by words or acts, nor do the circumstances in evidence tend to show any such state of case as would render admissible the evidence offered. Threats made by deceased, and the dangerous character of deceased, are only admissible when it is shown that at the time of the homicide the deceased did some act indicating his purpose then to take the life of the defendant, or do him some serious bodily harm. (*Irwin* v. *The State,* 43 Texas, 236; *Horbach* v. *The State,* Id., 242.) Or when the circumstances of the case raise a doubt in regard to the question whether the accused committed the homicide in self defence. (*Stevens* v. *The State,* 1 Texas Ct. App., 591; Whar. Cr. Ev., 80.)

In the case before us, the evidence shows that the deceased was killed while on horseback; that the fatal ball entered the back of his head, showing that he was shot by some one who was most probably in his rear; and that a short distance from where he was shot he fell from his horse to the ground. Deceased at the time was armed with a six shooter, which was found upon his body, partially withdrawn from the scabbard. It was shown that deceased habitually carried his six shooter. Upon this state of facts defendant's counsel contends that evidence of the dangerous character of deceased was admissible, the case being one of circumstantial evidence entirely. We do not think the evidence was admissible, there being a total absence of any proof showing or tending to show that at the time of the homicide the deceased was doing any act indicating a purpose to kill or injure the defendant, or tending to show that the homicide was committed in self-defense.

It was in proof that shortly before the homicide the defendant

B

purchased a large sized six shooter from one Fitzgerald. In explanation of this purchase and of his possession of a six shooter on the day of the homicide, the defendant offered to prove that at that time it was the custom and habit of every one in that county to carry upon their persons six shooters or other deadly weapons. This proposed evidence was rejected, and the action of the court in rejecting it was excepted to, and is assigned as error.

If the defendant had offered to prove that it was his own custom and habit at that time to wear a six shooter, or that he had purchased and was carrying this one for some legitimate purpose, such evidence would have been admissible as tending to rebut any unfavorable inference that might arise from the fact of his having the pistol. But this was not what he proposed to show. His proposition was to prove the custom of the country in carrying arms; the habits of others in that respect, not his own habit. He proposed to explain his act of obtaining and carrying the pistol, not by his own declarations accompanying the act, nor by his own habit of carrying a pistol, but by the custom of the country.

To hold such evidence to be admissible under the circumstances of this case would be going to a greater length in widening the avenues for the admission of testimony than this court has yet gone, or than would be supported by the most liberal authority. We do not think the doctrine of *res gestœ*, however broadly applied, would reasonably embrace the proposed evidence. It was remote, irrelevant and unimportant. Its rejection, so far as we are able to see, was not error, at least not such error as would necessitate a reversal of the judgment. (*Boothe* v. *The State*, 4 Texas Ct. App., 202; *Boon* v. *The State*, 42 Texas, 237.)

In relation to the various exceptions to the charge of the court, and to the refusal of the court to give charges asked by defendant's counsel, we will only say, without discussing these assignments of error in detail, that while the charge of the court as given is perhaps open to the criticism that it was too voluminous under the facts of the case, and might by a careful revision have been made more concise and clear, still we think it contained the whole law of the case correctly expressed, and in such manner as to be understood by the jury. Taken as a whole, in connection with the evidence, we do not think it is obnoxious to the exceptions made to it by defendant's counsel.

Nor do we think there was error in refusing to give the charges requested by defendant. In so far as these charges were correct and applicable, they had been substantially given in the general charge.

Although the evidence in support of the conviction is entirely circumstantial, we think in strength and conclusiveness it fills the requirements of the law, and that the verdict of guilty of murder in the first degree was not only warranted, but sternly demanded by the facts proved.

Finding no error in the record for which the judgment should be reversed, it is affirmed.

*Affirmed.*

Opinion delivered April 18, 1883.