THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ANTOINETTE TOLLA, PLAINTIFF IN ERROR.

Argued July 3, 1905—Decided November 20, 1905.

1. When upon the trial of a person indicted for killing John Sonta, it was disclosed that the name of the person killed was Joseph Sonta, the trial court had power under section 34 of the Criminal Procedure act to direct an amendment of the indictment.

2. The statute permitting amendments of an indictment when the name of any person injured by the commission of an offence is misstated therein, if the court shall consider that the defendant cannot be prejudiced thereby, is not violative of the constitutional provision that no person shall be held to answer for any criminal offence except on the presentment or indictment of a grand jury.

3. In a homicide case testimony of antecedent threats or acts of violence by the deceased against the defendant are not admissible, when it appears that at the time of the homicide there was no threat or act by the deceased, which, even in the light of any previous threats or acts, could justify the homicidal act.

4. The law fixes no precise age within which children are absolutely excluded from giving evidence.

On error to the Bergen Oyer and Terminer.

For the plaintiff in error, *Peter W. Stagg.*

For the state, *Ernest Koester,* prosecutor of the pleas.

The opinion of the court was delivered by

REED, J.   On the 4th of March, 1904, Antoinette Tolla shot with a pistol Joseph Sonta, who almost immediately died.   For this homicde she was indicted, tried and convicted of murder in the first degree.   The judgment entered upon this conviction is brought into this court by this writ of error.

The first assignment of error pressed on behalf of the defendant is that the court erred in permitting the indictment to be amended.

The defendant was indicted for killing John Sonta.   It appeared upon the trial that the name of the deceased was "Guieseppe" the Italian equivalent for the English "Joseph," instead of John Sonta.   Being moved by the prosecutor, the court directed that the name of the deceased be changed from John to Joseph.

It is not denied that the terms of the thirty-fourth section of the Criminal Procedure act (*Revision* 1898, *p.* 878), if constitutional, conferred power upon the court to direct this amendment.   This section provides that if there shall appear to be a variance between the statement in any indictment and the evidence, in the name or description of any person * * * alleged to be injured by the commission of the offence, it shall be lawful for the court, if it shall consider such variance not material to the merits of the case, and that the defendant cannot be prejudiced thereby in his defence on the merits, to order the indictment to be amended.   The insistence is that the legislature had not the ability to equip the court with power to change an indictment which charged a crime upon one person into an indictment which charged a crime upon another person.   If the legislation is invalid, it is because of the constitutional provision that no person shall

be held to answer for any criminal offence except on the presentment or indictment of a grand jury.

The grand jury presented the defendant for killing a person whose identity was certain; it was a person whose name was disclosed upon the trial to be Joseph instead of John Sonta. The grand jury knew that it was this person who was killed, and the defendant knew it. The amendment did not change the identity of the deceased, but only designated it in conformity with the facts developed. Nor was the man's name an essential part of the indictment in describing the crime. If the name of the deceased had been undiscoverable, the defendant could have been indicted for killing a person unknown. 1 *Bish. Cr. Pro.,* § 495. There can be no doubt that on the discovery of the real name, that name could have been inserted in the indictment by amendment. The point now under consideration was made in the case of *People* v. *Johnson,* 104 *N. Y.* 213, 216, and it was held, upon grounds entirely satisfactory, that the amendment being allowed under circumstances which assured to the accused party a full and fair hearing upon the only issue upon which the plea was material, the amendment was within the power of the court. There is a line of cases holding that when permitted by a statute a court has the power to change the name of the person upon whom injury has been inflicted, or the name of the owner of property which has been the subject of larceny or other criminal act. *State* v. *Hanks,* 39 *La. Ann.* 234; *People* v. *Herman,* 45 *Hun* 175; *Garvin* v. *State,* 52 *Miss.* 207; *Miller* v. *State,* 68 *Id.* 221; *State* v. *Craighead,* 32 *Mo.* 561; *State* v. *Casavant,* 64 *Vt.* 405; *Rough* v. *Commonwealth,* 78 *Pa. St.* 495.

There was no error in directing the amendment.

The remaining assignments of error are directed to the alleged erroneous exclusion of proffered testimony, to the reception of incompetent testimony and to alleged errors in the charge of the trial justice.

A proper appreciation of these assignments requires a brief statement of the homicidal occurrence.

Joseph Sonta was a married man living near the family of John and Antoinette Tolla. The latter lived in two rooms over a store. They were all Italians and were intimate. About one o'clock in the afternoon of March 4th, Joseph Sonta went to the rooms of the Tollas, where the Tollas, husband and wife, were. He sat down in a rocking chair. After a little while the wife left the room and went over to the house of Sonta, where she saw Mrs. Sonta and her daughter, Annie. After conversing with them a short time she returned to her rooms and found Joseph Sonta still sitting in the rocking chair, smoking a pipe; she approached Sonta and shot him, killing him almost instantly. On her trial her defence was that she killed Sonta in defence of her honor and her life. She asserted that the reason she shot him was that he wanted to take her honor away from her and that he wanted to kill her. For the purpose of showing the probability that she could have reasonably thought her honor or her life was in peril at the time she fired, testimony was tendered to show previous talks and conduct by Joseph Sonta exhibiting a desire to dishonor her. The assignments, from the sixth to the sixteenth, inclusive, are directed to the exclusion by the trial justice of questions to the defendant inquiring if Sonta and she had had trouble, and what happened, and whether Sonta had asked her to have sexual intercourse, and whether Sonta, at one time when her husband was absent, had come into her house and attempted to drag her into the bedroom and have intercourse with her, and respecting statements she had made to the wife of Sonta. The last question was designed to show the probability of such antecedent conduct of Sonta, and such antecedent talk and conduct were designed to show that the defendant, having knowledge of the disposition of Sonta, could have reasonably inferred from what occurred at the time of the homicide that her life, or honor, was in eminent danger.

This line of proffered testimony stands upon the same footing as offers to prove previous threats by the deceased in homicide cases, or by the prosecutor in cases of assault where the defendant sets up that he acted in self-defence. That previous threats or acts of violence afford no justification for

an assault or homicidal act is entirely settled. *Whart. Cr. Ev.*, § 757; *Whart. Hom.*, §§ 482, 606. If all the testimony inferentially possible in the light of what was offered and overruled had been introduced, it would not in itself have afforded the slightest ground of justification for this homicide. Such a justification must have arisen from what occurred at the time the shot was fired. The testimony of the previous acts and threats was only admissible to illustrate some possible feature of the actual occurrence which might, if thus illustrated, have led the jury to believe that the defendant had reasonable ground to conclude that her life or her honor was so menaced as to excuse the shooting. If it had appeared that Sonta was asleep and she, knowing him to be asleep, had shot him, it would be absurd to say that any previous act of his, however bad, would have justified the shooting or modified the degree of criminality. Under such a condition of affairs the proof of such acts would have been legally worthless as a basis for a legal verdict, and so irrelevant. It seems to be the logical conclusion that unless at the time of the homicide the deceased did something to indicate a present intention to harm the defendant there is nothing upon which the precedent acts can cast any light. There must be some present word or movement to be interpreted in the light of this knowledge of the disposition of the deceased.

This view is supported by a great weight of authority. *State* v. *Reed*, 137 *Mo.* 125, 137; *State* v. *Byrd*, 121 *N. C.* 684; *State* v. *McGonigle*, 14 *Wash.* 594, 599; *State* v. *Jackson*, 33 *La. Ann.* 1087; *State* v. *Janvier*, 37 *Id.* 644; *State* v. *Prickett*, 22 *Ala.* 39; *State* v. *Harrison*, 24 *Id.* 67; *State* v. *Hughey*, 47 *Id.* 97; *State* v. *Creswell*, 14 *Tex. Ct. App.* 1; *State* v. *West*, 18 *Id.* 644; *State* v. *Meyers*, 33 *Id.* 204; *State* v. *Evans*, 44 *Miss.* 762; *State* v. *Scott*, 4 *Ired. L.* 409.

In the State of New York, where it is permissible to show the reputation of the assailant who was killed for quarrelsomeness and vindictiveness, it was held, in *Thomas* v. *People*, 67 *N. Y.* 218, that such testimony was only admissible when it was shown that the assault had been committed or threat-

ened at the time when the homicide was committed, or immediately preceding it, or was intimately connected with it so as to justify the taking of life in self-defence. Such testimony was held to be rightly excluded in *Abbot* v. *People*, 86 *Id.* 460, 470, because there was no ground for claiming that the act was committed in self-defence. To the same purport is a long array of cases cited by Mr. Kerr in his article on "Homicide." *Am. & Eng. Encycl. L.* (*1st ed.*) 684, 685.

Turning to the evidence of what occurred at the time of this homicide, I am unable to discover any act or word by Sonta which, whatever his previous conduct may have been, can be forced into a suggestion of then present harm to the defendant. The defendant herself gives the following account of the affair: She says that Sonta came to her house about half-past one o'clock; that her husband was lying on a trunk, and he went away at once; she says that Sonta asked what Tolla always went away for when he (Sonta) came in, and she told him it was not on account of his (Sonta's) coming; then Sonta said something about killing her husband or my wife, and that she said to him, "You want to take these things out of your head or I will let you go out of my house with your face broke;" then he said, "Being you are, I will have to post you some way or shoot you, then I do what I wish to and shoot myself." She says that he had a revolver in one hand and a bunch of money in the other hand. At that moment Sonta's six-year-old son came in and Sonta shoved the revolver in one pocket and the money in another pocket. She says that the boy began to cry because of some remarks of his father, and that she went into another room and got a cake for the child, and at the same time got a revolver and put it in her pocket. She went out of the room and met her husband coming in the house; she then went out of the house and over to Sonta's house, where she remained for some time talking with Mrs. Sonta and her daughter, Annie. She returned and found Sonta sitting down alongside of a closet, with his shoulder towards the bedroom door, smoking. She says that her husband was

asleep and little Rocco was playing with her children. She said that when she got to the table she stopped, and Sonta turned towards her, and he was all of a color, and he put his hands to his prick, and he says, "Look what I got to suffer;" his eyes were all mixed up; looked at one time he was red and another time he was pale; then she shot him, because if she did not do what she did he would have shot her and her husband. She said that he said one word after she shot him, "You done me before I done you."

Immediately after the shots were fired Sonta was found sitting in the rocking chair with his legs crossed, with a briar pipe in his right hand, and with his head upon his breast. The autopsy showed four superficial wounds—two where a bullet had entered the temple, gone through the brain and out under the left jaw. No pistol seems to have been found other than the one used by the defendant. Her account of Sonta's exhibiting a pistol, as well as her statement of his remark after he was shot through the brain, is manifestly fanciful. But, taking her story as she told it, it appears that after Sonta's exhibition of the pistol, she procured her own pistol and went over to Sonta's house, where she remained for some time, and after she returned she shot Sonta as he was sitting cross-legged in the rocking chair, with his pipe in his right hand, her husband being present. The only act or word of Sonta's at that time was his placing his hand upon his person, coupled with the remark, "See what I got to suffer."

From this account, nothing that he did at the time could afford a justification for her act, and it is impossible for me to conceive how any previous conduct could change the significance of what he did so as to afford such a justification.

It is insisted by counsel for the plaintiff in error that she should have been permitted to show that she bought the pistol for the purpose of defending herself against Sonta, and that the previous acts and words of Sonta were relevant to show that she had ground for believing her person was in danger.

It seems sufficient to say that it appearing that she did not

employ the pistol in her self-defence, her motive in buying it became immaterial.

As a support to the plea of self-defence, the offers were rightly excluded.

Nor do I perceive that the offers were admissible to show the degree of her criminality.

The offers excluded were directed entirely to the proof of self-defence. It could not operate to reduce the grade of crime to manslaughter. Nothing occurred at the time, even in the light of any previous words or conduct of the deceased, which would operate to so modify the degree of criminality. Neither words nor indecent actions, unless accompanied by actual or threatened assault, afford provocation sufficient to reduce an intentional killing to manslaughter.

Nor would such proffered evidence be evidential in respect to the defendant's premeditation. The ground of the offer was to show that she bought the pistol to use in self-defence only, but, as already remarked, she did not use it in self-defence. She had just previously to the homicide armed herself with it, admittedly, to use upon Sonta. She had gone to Sonta's house, remained there for some time, and then returned to her own house, and, without justification, shot him. Neither the previous conduct of Sonta, nor the fact that such conduct caused her to purchase the pistol, could in the least modify the significance of her conduct at the time.

It is also assigned for error that the trial justice improperly permitted a boy six years old to testify for the state. The boy appears to have been unusually precocious, and to have been qualified by intelligence and by a knowledge of the sanction requisite to equip him with eligibility as a witness. The question whether he should be permitted to testify was within the discretion of the trial justice, and that discretion was not abused.

The law fixes no precise age within which children are absolutely excluded from giving evidence. *Tayl. Ev.* 1377; *Rosc. Cr. Ev.* 106; *Wheeler* v. *United States,* 159 *U. S.* 523. . In respect to the assignments directed to alleged errors

in the charge, it is sufficient to say that the law was accurately and carefully charged. There is no assignment respecting it which is of sufficient importance to require an extended consideration.

The judgment should be affirmed.

GARRISON, J. (dissenting). I think that the excluded testimony (1) as to antecedent sexual assaults and indignities, and (2) as to the purpose for which the defendant bought the pistol, should have been admitted, not as tending to justify the homicidal act, but because of the obvious bearing of such testimony upon the degree of the defendant's crime. The defendant was properly convicted of the crime of murder; whether she was guilty in the first degree depended upon her state of mind when she shot Sonta. The testimony that was permitted to go to the jury was entirely consistent with the conclusion reached by it, viz., that her state of mind on that occasion was one evincing deliberation and premeditation, but had the excluded testimony been admitted the verdict upon this vital point might have been different.

What effect a prolonged and persistent course of efforts to debauch a woman will have upon her state of mind is one question, but to say that it is the same result that would follow from a single solicitation appears to me to be entirely unsupportable. Especially is this so if in the course of such persecution the woman, having armed herself, shoots her persecutor apparently upon such single solicitation.

As this case was tried, one strong element of premeditation, perhaps the strongest, was the purchase of the pistol; but I cannot agree that because the pistol was not used in self-defence it may not have been purchased with that object, and if it was, then this strong element of premeditation drops out of the case, or at least is rendered doubtful.

I think, also, that the defendant should have been allowed to show the persistence of Sonta's antecedent solicitations and accompanying threats and assaults. Whether what occurred just at the time of the shooting was an isolated in-

524     COURT OF ERRORS AND APPEALS.

Metlar v. Middlesex and Somerset Trac. Co.     72 *N. J. L.*

stance of indignity or whether it was the climax of a long course of like assaults upon her chastity to which the woman had been subjected, makes, in my opinion, a world of difference in reaching a correct estimate of the state of mind likely to be induced in her. In the latter case the persistence of the debaucher, the constant repetition of the insult, the inability of the wife to put an end to the indignity, even in her husband's presence, are of the very essence of the question as to the state of mind engendered in her upon that repetition of the offence that proved to be the last.

A judicial ruling that excludes that which is essential to a correct estimate of the woman's mental state and admits only the culminating act—the last straw, as it were—is based upon a faulty psychology, and as the distinction between the degrees of murder is at bottom a psychological question, such ruling must likewise be erroneous in point of law.

Upon these considerations, I shall vote to reverse.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, FORT, PITNEY, SWAYZE, REED, GREEN, GRAY. 8.

*For reversal*—DIXON, GARRISON, BOGERT, VREDENBURGH, VROOM. 5.