## JOHN T. IRWIN v. THE STATE.

1. HOMICIDE, IN SELF-DEFENSE.—One who seeks to justify a homicide on the ground of threats against his life, under art. 612 of the code, must show that the deceased at the time of the homicide did some act which was reasonably calculated to induce the belief, and did induce the belief, that the accused was then in immediate and imminent danger of losing his life, or of suffering some great bodily harm, from that which really was, or reasonably appeared to be *at the time*, an impending attack by the deceased. It is not practicable to fix on what that act demonstrating the intention shall be, but it must be some act which is reasonably calculated to induce the belief that the threatened attack has *then* commenced, to be *then* executed, and not a mere act or preparation to execute the threat at some other period of time, either speedy or remote.

2. FORMER THREATS, WHEN NOT ADMISSIBLE.—Neither the former threats to assassinate or the desperate character of the deceased can be admitted in evidence, under art. 612, unless the deceased is shown to have done some act at the time of the homicide indicating his purpose then to take the life of the deceased.

APPEAL from Washington. Tried below before the Hon. I. B. McFarland.

*Thomas G. Kittrell*, for the State, filed an able brief, citing Lander *v.* The State, 12 Tex., 462; 4 Iredell, 409; Penal Code, art. 612.

ROBERTS, CHIEF JUSTICE.—The defendant was indicted and convicted for the murder of William Fisher, of the second degree, and his punishment was assessed at five years in the penitentiary. The killing took place at the house of Mrs. Fisher, the aunt of both parties, about one hour before day, where both of the parties went to bed that night, the defendant in one of the rooms with three other young men, and the deceased on the gallery, on a pallet, with his cousin, a young man. The deceased, lying on the outside, was shot on the side next to his cousin. No one saw the shooting. There was no evidence of any struggle or rencounter. No weapons were found on the

deceased or about the pallet. Upon the report of the gun the cousin of the deceased, lying with him on the pallet, was aroused from his sleep, and found the deceased lying on the pallet, wounded in the side next to him. Three of the young men sleeping in the room, whose door opened into the gallery, in their alarm jumped out of a window, ran around the house, and found the deceased lying on the pallet, at the end of the gallery, wounded. Upon search being made the defendant was not found about the house or premises. His clothes and shoes were in the room where he had gone to bed, and the shot-gun that he had brought there, and which was in the room when he went to bed, was gone. He sent for his clothes during the day after the morning of the killing and the gun was returned to the person from whom it had been borrowed.

There had been a serious difficulty between these parties two or three days before the killing at a storehouse, in which the deceased stabbed the defendant with a pocket-knife, and afterwards the deceased made violent threats that he would kill the defendant, which were commuicated to the defendant by several persons. The deceased was proved to be a very dangerous young man, likely to carry out his threats, and the defendant was proved to be a very peaceable young man.

There were other incidental facts proved, which need not be referred to now in order to present the points of error complained of.

The counsel for the defendant presents questions upon two grounds of defense. First, that it was not sufficiently established in proof that the defendant killed the deceased; and, second, if he did kill him, it was in self-defense.

Upon the first point the evidence, though circumstantial, was entirely sufficient to justify the verdict of the jury, that defendant did the killing. The only evidence offered to show any probability that there was a rencounter of any

sort when the killing took place was the evidence of two witnesses that the deceased, about 11 o'clock of that night, got up, belted on his knife, and taking his six-shooter in hand went into the room and stopped before the bed of the defendant, and on returning to his pallet said, that the damned scoundrel was not asleep, but was lying there chewing his tobacco. This showed simply an intention on the part of the deceased to discover what the defendant was doing, under an apprehension that he was in danger from him, or to discover how best he could take advantage of him, and kill him without a struggle if he found him asleep. This was several hours before the killing, and as evidence tending to show any rencounter at the time of the killing, it is not entitled to any weight, in the absence of a single fact developed in the evidence in support of such a view, but everything to the contrary.

The only substantial issue before the jury, under the evidence, was, did defendant kill the deceased. If they were satisfied that he did there was not a single fact or the vestige of a fact proved that could serve as a predicate for justifying or excusing the act of killing at the time it was done.

The court gave a very correct charge upon all the degrees of homicide, and closed by telling the jury that "if from the evidence you have a reasonable doubt of the defendant's guilt you will acquit him."

The defendant's counsel asked the court to give several additional charges, which were extracts from opinions of courts and from elementary authors. These were refused, in which there was no error, the court having fully charged the law as applicable to the case made by the evidence, and, indeed, much more than the real issue in the case required.

There were bills of exception taken by defendant's counsel to the ruling of the court in excluding evidence offered by the defendant as to threats and character of deceased.

One of the questions not allowed to be answered, upon objection by the district attorney, was as follows, to Sherman D. Dodd, witness for defendant: "Were you present, Sunday previous to the killing charged in the indictment, when Sanders communicated to the accused threats made by the deceased to take the life of the accused?"

Further, also, "the defendant to show by witness the intensity of the deceased's character as a dangerous man, that he was reputed to have assassinated two men, and had boasted of it to the witness John A. Maxwell, and that he was dreaded because of his reputed assassinations, of which he had boasted to Maxwell." This was also objected to by the district attorney and excluded by the court.

The violent, dangerous character of the deceased and his repeated threats to kill defendant, and that he was informed of them before the killing, was fully proved by several witnesses already. It is unnecessary to consider why the district attorney could suffer such questions to be raised after those matters had been so fully gone into, because, had the evidence been admitted, it would have stood on a footing with the abundant evidence on those subjects that had already gone to the jury without objection, as constituting no part of a possible defense on part of defendant, considered in connection with the established facts of the case. For the evidence exhibited no act of the deceased, nor the least presumption of an act on the part of the deceased, at the time he was killed, which the threats and his character to execute them would or could possibly give significance to. In the absence of any such act on the part of the deceased at that time, it was perfectly immaterial how desperate was his character and how violent were his threats to take the life of the defendant. Suppose what was offered and rejected had been admitted with the rest, as might well have been done, except perhaps such an investigation must stop at some point, the court must have charged the jury, as it did in effect, that such char-

acter and threats amounted to nothing unless the defendant had reason to believe that deceased was at the time he was killed attempting some act of violence, in some shape or other, towards the defendant.

It is not even pretended that there was any proof whatever of any such thing. (Paschal's Dig., 2270; Lander v. The State, 12 Tex., 479; Johnson v. The State, 27 Tex., 767.)

In the case of Johnson v. The State, decided by this court long after the adoption of the Penal Code now in force, it was said by Justice Moore, delivering the opinion: " The circumstances under which a party who takes the life of another may rely upon 'threats' as an element in his defense is clearly shown in art. 612 of the Penal Code. If at the time of the homicide there is any act from which the accused may reasonably infer an intention to carry them into effect, he is justified in resorting to such means as may then be in his power to defend and protect himself against their execution. But in no case, under the provisions of the code or out of it, if we were permitted to look elsewhere to ascertain the law upon the subject, can it be held that mere threats, or threats unaccompanied by some demonstration from which the accused may reasonably infer the intention of their execution by the deceased, will either justify homicide or reduce it from murder to manslaughter." (27 Tex., 767.) This is a clear statement of the established law, however else or with different phraseology it may be stated in other opinions of courts or in elementary treatises on criminal law.

Our Penal Code, which is in the main a reproduction of the rules of the common law, gives to a person whose life is seriously threatened by a desperate and dangerous man the alternative of seeking the protection of the government from the intended assassination, (which is too seldom resorted to,) or to abide the risk of protecting himself by his own strong arm. If he should choose the latter mode or

defense of his person, it is allowed by law only under the limitation and condition that he must have the patient watchfulness, courageous firmness, and reasonable discretion to await the doing of some act by his antagonist which is reasonably calculated to induce the belief, and does induce the belief, that he is then in immediate and imminent danger of losing his life, or of suffering some great bodily harm from that which really is, or reasonably appears to be at the time, the impending attack of his assailant. (Paschal's Dig., art. 2226.)

The law does not fix, nor is it practicable beforehand to fix, upon what that act demonstrating the intention shall be; still it must be some act which is reasonably calculated to induce the belief that the threatened attack has then commenced to be then executed, and not a mere act of preparation to execute the threat at some future time, as a week, a day, or an hour, or other indefinite period of time.

The court charged the jury that "no threat, however serious or violent, or however often repeated, will justify a party in hunting up his antagonist and slaying him unaware of approaching danger." This charge was appropriate to the facts of this case.

Now, as there was no act of the deceased proved at the time of the killing indicating an intention to carry out his threats at that time, the previous threats made by him could constitute no part of a defense for taking his life at that time, and therefore we cannot now hold that it was error in the court to exclude the evidence of threats and of violent character of the deceased, which, if admitted, would have been only an additional accumulation of the great amount of evidence on those subjects which had been already admitted, all of which did not, and under the law, as properly charged by the court could not, avail the defendant, as constituting an element in his defense, under the facts and circumstance of the case as proved on the trial. (The People v. Murray, 10 Cal., 309; State of Minnesota v.

16

Dumphey, 4 Minn., 448; The State *v*. Barfield, 8 Ired., (N. C.,) 352; Franklin *v*. The State, 29 Ala., 19, 20; Pritchett *v*. The State. 22 Ala., 39; See Horbach *v*. The State, decided this term.)

The question of the venue was not raised on the trial by any appropriate exception or plea, and there is nothing in the evidence or in the proceedings of the case in the record from which we can see that the District Court of Washington county did not have jurisdiction, as the offense was proved to have been committed in that county before the organization of Lee county out of the territory in which Lee county was created. (See Acts 14th Leg., p. 97, sec. 11.)

Finding no error in the record which would justify this court in reversing the case, the judgment is affirmed.

AFFIRMED.