Opinion delivered April 13, 1887.

No. 5221.

W. B. HOWARD *v.* THE STATE.

1. MANSLAUGHTER — AGGRAVATED ASSAULT — ADEQUATE CAUSE — PREDI-
CATE—EVIDENCE.—The uttering of insulting words by the deceased
about a female relative of the slayer, though they were not uttered in
the presence of the slayer, is adequate cause to reduce a homicide to man-
slaughter, provided the slayer was informed of the utterance of the in-
sulting words, and slew the deceased upon the first meeting after being
so informed. But, before the slayer can prove the utterance of the in-
sulting words in mitigation of the homicide, it devolves upon him to es-
tablish a complete predicate by showing that he was informed of the
utterance of the insulting words before he killed the deceased, and that
he killed him on the first meeting thereafter. Proof that the insulting
words were communicated to the slayer is not enough to establish a pred-
cate;—it must go farther and show that the killing occurred upon the
first meeting of the parties.

2. SAME—THREATS—INTERPRETATION OF THE CODES.—Article 608 of the
Penal Code of this State reads as follows: "Where a defendant seeks to
justify himself on the ground of threats against his own life, he may be
permitted to introduce proof of the threats made, but the same shall
not be regarded as affording a justification for the offense, unless it be
shown that, at the time of the homicide, the person killed, by some act
then done, manifested an intention to execute the threats so made."
*Held*, that the effect of the said article is not to control the admissibility
of previous threats as evidence in homicide cases, but only to control the
effect of such evidence when the threats are relied upon to justify the
homicide. Previous threats, therefore, are *per se* admissible as inde-
pendent evidence in homicide cases, and may be proved without a predi-
cate. See the opinion *in extenso* for a discussion of the question, and for
evidence *held* to have been erroneously excluded.

3. SAME—CHARGE OF THE COURT—CASE APPROVED.—In order to raise the
issue of manslaughter, it is not essential that the overt act relied upon
was sufficient to raise the issue of self defense; but if, in connection
with other antecedent facts and circumstances, it excited in the mind of
the accused, and was sufficient to excite in the mind of a person of ordi-
nary temper, such sudden passion as would render it incapable of cool re-

flection, then adequate cause would be produced sufficient to raise the issue of manslaughter, and the law of manslaughter would be part of the law of the case. See the opinion for a case to which the rule applies, and which demanded of the trial court a charge upon the law of manslaughter; and note the approval of Hobbs's case, 16 Texas Court of Appeals, 523.

APPEAL from the District Court of Hunt. Tried below before the Hon. J. A. B. Putman.

The conviction in this case was for an assault with intent to murder one W. R. Russell in Hunt county, Texas, on the fifth day of March, 1886. The penalty assessed against the appellant was a term of two years in the penitentiary.

J. W. Barr was the first witness for the State. It is not necessary to this report that it follow this witness's minute description of the topography of the town of Kingston, in which the shooting occurred, further than to note that he locates the post office and the defendant's printing office on the same side of Main street, and on contiguous blocks, the defendant's office occupying the space at the intersection of Main and Church streets. The witness was standing in front of the Adams building, just south of defendant's office, immediately before, and at the time of the shooting, which occurred about nine o'clock on the morning of May 5, 1886. He did not see Russell when the latter passed south, going to the post office. He first saw him when, having been to the post office, and got the newspaper or letter he carried in his hand, he stepped off the sidewalk north of defendant's printing office, to cross Church street. If Russell looked into defendant's office witness did not know it. He had got but a few steps beyond defendant's office when defendant stepped out of the door with a double barrelled shot gun in his hands, the muzzle pointing upwards. Russell was then in the middle of the street, twelve or fifteen steps from defendant and going from him, with his back towards defendant. Defendant looked at or towards Russell and raised his gun to shoot. Witness called to him: "Howard, don't do that." Defendant turned his head towards witness, who repeated his remark. Defendant turned his head again towards Russell and fired. He then lowered his gun, but immediately threw it up and fired again. Between the two shots, Russell ran about thirty feet, and continued to run after the last shot. Russell had done nothing whatever that the witness saw, except walk by defendant's

office on the side walk.  The witness's attention was particularly attracted by the first shot, and he would not say that Russell could not have done something without his seeing it.  Defendant stepped into his office, after the shooting, remained a minute or two, and left town horse back about fifteen minutes later, and was not in town again for two or three weeks. Throughout the shooting the witness stood in front of the Adams house, the next door south of the defendant's printing office.

Doctor E. R. Hawkins, the next witness for the State, described the nature of Russell's wounds, when he was first called in to attend him, eight days after the shooting.  Two of the balls inflicted serious and dangerous wounds, and indicated that the person by whom they were fired must have stood behind and a little to the left of Russell.  Russell's entire recovery from the effects of those wounds was, in the opinion of the witness, extremely doubtful.

Tip Cunningham was the next witness for the State.  He testified, in substance, that he was standing on the platform in front of Howard's office at the time of the shooting, talking to Frank Henslee, J. W. Barr and Green Defee.  Russell and a Mr. Quarles passed by the witness, walking along the pavement, going north from towards the post office.  Russell had a letter or a paper in his hands, which he appeared to be reading.  He was walking rather fast, and merely spoke to witness by name as he passed.  The opening of the defendant's door, after Russell had passed beyond it, attracted the witness's attention, and looking in that direction, he saw defendant step out of the door with a shot gun in his hands.  He immediately presented his gun towards Russell, and witness called to him: "You, Howard!" and some one (Mr. Defee, according to witness's recollection), called to him: "Don't do that, Howard."  The witness was then in such position that he commanded a plain view of both Howard and Russell, and could see that Howard was pointing his gun directly at Russell.  When Howard fired his first shot, it appeared to witness that Russell stepped into low ground and ducked his head, his hands being carried before him.  He did not turn his head at the time or before the first shot was fired, but ran north at the report.  Howard fired his second shot as Russell passed behind an old iron safe and a pair of scales. About ten minutes later, witness went up the street to the barber shop, where he found Russell lying wounded.  He felt the wounds in Russell's head, but did not see the others.  After

firing the second shot, Howard remarked: "If any of Russell's friends are here, they will get it too." Howard then got a horse at the gate of Dick Yeakers's fence, the witness thought from Mr. England, and mounted with his gun still in his hands. About this time the constable appeared, and Howard covered him with his gun and told him to go back, which the constable immediately did. The justice of the peace then appeared upon the scene, and demanded, as a civil officer, the surrender of the defendant. Defendant replied: "You are a d—d liar; you are not a civil officer." The justice then told Howard that he had shot a boy. Howard replied: "I am sorry, but you go back." A few minutes after the second shot was fired, William Norman appeared on the scene. Howard threw his gun into position and said: "There is another of the d—d rascals." Two months elapsed before witness saw Russell out of the house. He then appeared to be very feeble, and soon went to Terrell.

On his cross examination, the witness declared that he had always been friendly to Howard, and that he had contributed nothing to the employment of prosecuting counsel in this case. Russell was the city marshal of Kingston at the time he was shot. Russell's hands, at the time the first shot was fired, were in front of him, as indicated by the points of his elbows which witness could distinctly see. He was about thirty-five feet distant from Howard when the latter first fired. The words addressed to Howard when he appeared with his gun were spoken loud enough to have been heard by Russell. Russell made no halt, nor did he turn his head at Howard's office. Russell hallooed and ran straight forward when the first shot was fired. Quarles, who was walking with him, ran west. Colonel Hardison, who was walking in front of the pair, ran towards the railroad. Witness knew nothing about a previous difficulty between Howard and Russell. Mr. Fitzpatrick's little boy was shot in the chin by one of the wild buckshot. Mr. Overholt was also shot—through the body—and was laid up two or three months.

Sheriff Hale testified, for the State, that he and his deputies searched for Howard for some time after the shooting, and failed to find him. After Russell was supposed to have so far recovered as to be out of danger, Howard sent for one of the deputies and surrendered, a bond of one thousand five hundred dollars having been agreed upon.

T. J. Foster testified, for the State, in substance, that he was

in Patterson's saloon when the shooting occurred, and heard the reports of the pistol. Russell came into the saloon with his left hand behind him, holding either a paper or a handkerchief. He held his hat in his other hand. He said that he was shot, and asked for and got a pistol, and started out but returned. His coat was then taken off by the witness, and he was found to be shot once through the head and twice through the back. He had no pistol or other weapon on his person when he was shot. Overholt and young Fitzpatrick were both shot by one of the discharges fired at Russell. Overholt was seriously wounded, and was laid up several weeks. Witness did not know who paid Overholt's expenses during his confinement, nor did he know the present whereabouts of Overholt.

D. A. Russell, the brother of the injured man, testified, for the State, that his brother was now in Terrell, Texas, confined the greater part of his time to his bed. He was physically unable to attend this trial.

The State closed.

A. A. England was the first witness for the defense. He testified, in substance, that when the shooting occurred he was standing in front of the lumber yard office, between seventy-five and one hundred yards distant from, and in plain view of, Howard's printing office. He saw Russell and Quarles just before they reached Howard's office, going north. Both Russell and Quarles, when they reached the south window of the printing office, turned their heads and looked in. When Russell and Quarles reached a point some little distance north of the printing office witness heard some one exclaim: "Look out!" He then saw Quarles run. Russell then looked back and fled. Witness then observed Howard's gun held in a shooting position, and the first shot was fired. Russell was then looking back, with his hands swinging around his body. When Howard fired the second shot Russell was running.

Cross examined, the witness testified that William Cole was with him at the time, but denied that he told Cole that if Russell passed Howard's office, Howard would shoot him. He did say, however, that he feared trouble between Howard and Russell. Witness did not remember whether the printing office door was open or closed when Russell passed it. Witness did not see Howard when he got the horse, nor did he see him for some time after he left. Witness did not know whose horse Howard rode off, but Vancleve's horse, which, at the time, was in the

barn at witness's boarding house, was missing for some time. Witness put the saddle on Vancleve's horse, but did not know that defendant rode him off. Howard did not tell witness to saddle Vancleve's horse for him. Witness found the saddle in the barn. He did not know who owned it, but thought it belonged to Howard. Witness did not put the bridle on the horse, but left the animal in the barn with the saddle on. Witness did not remember whether the horse was hitched when he put the saddle on or not. The horse was saddled after the shooting. Russell and Quarles had passed Howard's office when the latter came out with the gun. Howard at first held the gun with the muzzle angling towards the ground. Some one shouted : "Look out." Russell turned enough to throw his side rather than his back towards Howard ; Howard fired and Russell ran, and when Howard, a few seconds later, fired the second shot, Russell was running nearly due north with his back towards Howard.

Albert Patterson testified, for the defense, in substance, that he knew of, and was present and saw, an unusual occurrance in Howard's office about a month before the shooting.

M. L. Hanley testified, for the defense, that, on his way to the post office, he met Russell and Quarles about twenty steps from Howard's office, going in that direction. Witness stopped to talk to some one, and observed that when Russell reached the office he made a hesitating halt, peeped in at the window and walked on. After Russell and Quarles had reached a point a short distance beyond the door, Howard stepped out with his gun. Russell turned and threw his hand up, with something in it, and Howard raised his gun and fired. When Russell first turned, he threw his right hand to his left side, and then turned almost completely around. Howard was then raising his gun to his shoulder, and he fired just as Russell was turning his head away. If any thing was said by any one at or about the time Howard fired, witness, who was somewhat deaf, did not hear it. Russell merely halted when he looked in at the said window—he did not stop.

Cross examined, the witness testified that if Barr was near the printing office, or within five feet of witness at the time of the shooting, witness did not know it. If any one said "Howard, don't do that" before the first shot was fired, the witness did not hear it. Russell turned and looked toward Howard before the latter shot, but did not run until the shot was fired. Before Howard fired, Russell placed his right hand under his coat on

the left hand side. Witness stopped after he met and passed Russell and Quarles, because he was then expecting trouble between Russell and Howard. The witness declared that he was not on unfriendly terms with Russell at the time of the shooting nor at the time of this trial; and denied that he ever applied for a deputy marshalship, and for a free pass into a show, and been refused in both instances by Russell.

A large number of witnesses introduced by the defense testified that Howard had maintained, during his residence in Kingston, the reputation of a law abiding, inoffensive citizen.

The defense closed.

Frank Hensley was introduced by the State, in rebuttal, and denied that Russell halted at the printing office, or peeped in at the window. He denied that Russell halted or looked back, or turned his body or head at any time after he and Quarles got beyond the printing office, up to the time the first shot was fired. When that shot was fired Russell and Quarles were going north, with their backs toward Howard, reading or looking at a paper which Russell had in his hands. Witness was not prejudiced against defendant, but was not on friendly terms with him.

William Quarles testified, for the State, in rebuttal, that he was with Russell, and had hold of Russel's left arm, the two looking at an envelope, when the first shot was fired. Russell did not stop nor halt before Howard's office, nor did he peep into that office through a window or door. He made no halt, nor did he look back nor turn his body or head, up to the firing of the first shot. He then threw up his hands and fled. Witness was not then, and is not now, friendly with Howard, and had employed counsel to prosecute this case.

John Hamlin testified, for the State, in rebuttal, that he was standing within six feet of William Cole and A. A. England, in front of the lumber yard office, at the time of the shooting. He heard England tell Cole that if Russell passed Howard's office he believed Howard would shoot him. The witness then asked England where Howard's office was, and England pointed it out to him. Russell and Quarles had not then reached the printing office. Russell made no stop nor halt at either window or door, nor did he look toward either window or door as he passed. He did not stop, look back, nor turn his body or head, after he passed, up to the time the first shot was fired. This witness described the shooting substantially as did the other witnesses for the State.

In the course of the trial the defense reserved some eight or ten bills of exception to the exclusion by the court of testimony offered to prove threats and threatening conduct of Russell against Howard, the defendant. This rejected testimony, as alleged in the bills of exception, was expected to be elicited from a number of witnesses, and, in substance, was as follows:

By A. A. England, that Russell, the day prior to the shooting, said that he would kill Howard (defendant) before morning.

By R. M. File, that he saw Russell in front of defendant's printing office the evening before the shooting; that Russell changed his pistol from his belt to his pocket, slipped up to the window of the office where there was a broken pane of glass, stopped to peep in, and, when the witness approached, went around the corner, saying "d—n him, I'll get him yet."

By Logan Jacobs, that he also, the day before the shooting, saw Russell in front of defendant's printing office, changing his pistol from his belt to his pocket, and looking into the window of the office. In explaining the bill of exceptions, the trial judge states that there was no evidence that Russell (when shot) was making any demonstration to carry out any prior threats.

By M. L. Hanley, that in a conversation with Russell, the evening before the shooting, the latter said that he had drawn a pistol on "that d—n son of a bitch, Howard" and came near shooting him, in Harrell's store, and that he intended to kill him, "the d—d son of a whore;" and, further, that he had beat h—ll out of Howard once, but it had not stopped him from making remarks in his paper about city officers, but that he (Russell) guessed a six shooter ball would stop the scoundrel; and that he (Hanley), just before the shooting, told the defendant exactly what Russell had said.

By Sam Culver, that, one evening about dark, some four or five weeks before the shooting, he saw W. R. Russell, Al. Patterson, Bill Norman and Quarles in Patterson's saloon, and heard Russell say to the others that Howard had published in his paper that the town officers in this country, marshal and police, did not try to suppress gambling, or to prevent the sale of whisky on Sunday, and that he (Russell) had been to Greenville that day, and a Greenville policeman told him if he (Russell) would beat h—ll out of Howard he (the policeman) would pay the expenses, and that he (Russell) would do it that night if they (Norman, Quarles and Patterson) would go with him; that Norman, Quarles and Patterson agreed to go, and said they would help if

necessary, and Russell replied that it would not be necessary, for, if Howard resisted, he, Russell, would blow his d—d brains out; that Patterson then broke a billiard cue and handed the butt end of it to Russell, saying "that would be good to salt him down with." That he (the proposed witness Culver) saw the said four men, afterwards, but the same night, come into Patterson's saloon, and Russell put the billiard cue, which then was bloody, on the base shelf of the bar, and said to Patterson: "Al., keep that as a sacred relic; I gave him h—ll with it, but I'll not use it on him any more, for, if he don't leave this town, I'll shoot a hole through his d—d paunch that you can pitch a rail through." That he (the witness Culver), not exceeding ten days before the shooting, had a conversation with Russell in which the latter said that Howard could not live in the same town with him; and that, about four days before the shooting, Russell presented at Howard a cocked six shooter, and the latter jumped into a store and shut the door.

By Sam Hightower, that Russell, on the Saturday before he was shot, was in front of Howard's printing office, with the "Chronicle" (Howard's publication) in his left hand, and a large six shooter in his right hand, and said that Howard had put it in his paper that whisky was still sold in Kingston on Sunday, and that he (Russell) was waiting for Howard to come out of the door, and intended to make him eat his d—d paper, or kill him; and that, on the next day, he, the witness, communicated to Howard (the defendant) what Russell had said. That, late on the Saturday evening before the shooting, as the defendant was going towards his boarding house, Russell, with a six shooter in his hand, followed him at some distance, and said "go, you d—d skulking dog; if you hadn't slipped out at the back door I'd have made you eat this dirty sheet of yours, and, d—n you, if you ever come out at your front door again I'll kill you."

By R. F. England, that, on Monday before the shooting, he had a conversation with Russell, in which the latter said that no man could live in Kingston and speak disrespectfully of the city officials, and "that's what Howard is doing;" and that if he, Russell, couldn't stop it in one way he could in another—that he would shoot his, Howard's, d—d brains out. That Russell further said that Howard had put him under a peace bond, but Esquire Edwards had released him from the bond, and now, by G—d, he could do as he pleased, and he proposed to do it. That

the witness told the defendant, before the shooting, just what Russell had said. That the witness, having heard of an unusual occurrence at Howard's office, one night some three or four weeks before the shooting, immediately went there and saw blood on the floor and the bed, and saw that the type and other furniture were scattered over the room, and saw Howard, himself, beaten and bruised, lying on the bed, bleeding profusely, and unable to get up without assistance.

By J. L. Brown, that a week before the shooting, Russell said he intended to make Howard leave the town and carry his d—d paper with him; and that he, the witness, communicated to Howard what Russell had said, and told Howard that Russell would kill him.

By W. P. Porter, that about half an hour after dark, two days before the shooting, he saw Russell, pistol in hand, standing at the side of the back door of Howard's printing office and watching the door, and, when witness came suddenly around the corner, Russell put up his pistol.

By Ed. White, that he remembered the occurrence at Howard's printing office, some three or four weeks before the shooting, and was at the printing office immediately after that occurrence transpired, and saw W. R. Russell come there; that Russell walked into the room with his pistol in his hand and flourished it around, saying, "Howard, G—d d—n your dog's hide of you, did I give you enough of it a while ago? If I didn't, I'll give it to you now," and then he swore that no d—d sap headed printer could make remarks about city officers in a four by six newspaper and live in the same town with him. That Russell then said to Howard: "I used a billiard cue a while ago, but next time I'll use this," slapping his other hand on his pistol. That Bill Norman, Steve Green and William Quarles were also there, and were hallooing, "Hurrah for Russell," and swearing Russell was the best city marshal in the State.

By A. J. Buchanan, that the night before the shooting, he saw Russell, with his pistol, watching the path which the defendant traveled in going from his office to his boarding house, and witness told defendant of this before the shooting.

By A. R. Cushman, county attorney of Hunt county, that a case was pending in the county court against W. R. Russell for an aggravated assault on this defendant; which case had been pending since February, 1886.

By A. A. England and some twenty others; that W. R. Rus-

sell, in the Kingston community, was generally reputed to be a violent and dangerous man, who habitually went armed, and who might reasonably be expected to execute a serious threat previously made by him.

By Jesse T. Harrell, that the evening before the shooting, the defendant was standing in and about half way of his, Harrell's, store, when Russell came to the door, entered, drew his pistol, presented it at the defendant, cursed him, and told him: "You d—n son of a bitch; you have made a complaint against me, and the sheriff has just arrested me and made me give bond; but, d—n you, I want you to understand that you shall never testify against me while powder will burn;" that Russell then advised defendant to go out at the back door, and the defendant, who meanwhile did and said nothing, went out at the back door, and Russell left by the front door.

Irrelevancy, immateriality and no predicate, were the objections made by the State to all this proposed and excluded testimony. By the charge of the court the jury were instructed not to consider the testimony with regard to the wounding of Overholt and young Fitzpatrick.

*R. H. Taylor* and *Perkins, Gilbert & Perkins,* filed an able brief and argument for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This appeal is from a judgment of conviction for assault with intent to murder. Whilst the record submitted to us is very voluminous, the material questions raised may all be disposed of, for the purposes of this appeal, by the determination of a few general propositions which are capable of being formulated out of the many bills of exception reserved at the trial and now insisted upon as error by appellant.

1. The court refused to charge the jury the law of manslaughter as applicable to the facts in evidence which tended to establish manslaughter, and would, therefore, reduce the defendant's crime to aggravated assault.

2. That the court refused and declined to charge upon self defense.

3. The court excluded evidence of antecedent acts and conduct of the injured party toward, and previous threats made by

him against, the accused, which would have tended to rebut the presumption of malice and mitigate the offense charged.

Manslaughter was only predicable, if at all, upon two theories or phases of the evidence proposed and excluded, going to show adequate cause, to wit, first, insulting words toward the mother of defendant; secondly, sudden passion, either anger, rage or terror, provoked by the acts and conduct of the injured party at the time of the shooting, rendering defendant's mind incapable of cool reflection. (Penal Code, art. 594.)

As to insulting words, appellant's tenth bill of exceptions shows that the court refused to permit appellant to prove by the witness Hanley a conversation between the witness and the injured party, Russell, on the evening before the shooting, in which Russell had said that he intended to kill defendant,—" the d—d son of a whore." This testimony was refused by the court upon the ground that it was immaterial and irrelevant, and because no predicate was laid for its introduction. The ruling was correct since, though it was made to appear that the witness had informed accused of the insulting words, it is not made to appear that the shooting took place at the first meeting betwen the parties after accused was so informed. This was essential as a predicate to the admissibility of the evidence. (Penal Code, art. 597, sub-div. 4, and art. 598 ; Eanes v. The State, 10 Texas Ct. App., 422 ; Neiland v. The State, 19 Texas Ct. App., 166 ; Paulin v. The State, 21 Texas Ct. App., 436 ; Orman v. The State, 22 Texas Ct. App., 604.)

All evidence of antecedent acts, conduct and threats of Russell towards appellant were, upon objection by the State, denied and excluded by the court upon the ground, as we gather from the bills of exception, that they were irrelevant and immaterial in that no predicate was laid for their introduction by showing that Russell, at the time of the shooting, was doing some overt act to provoke adequate cause in the mind of defendant, or going to show an intent on his part to execute such previous theats.

Is this the rule with regard to threats as evidence? Must an overt act be established as a predicate to their admissibility? Or are they in all cases admissible as evidence *per se ?*

Our statute provides that " where a defendant seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the

offense unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made.   (Penal Code, art. 608.)

This statute does not pretend to define the rule as to the admissibility of the threats as evidence, but only the effect to be given to threats when admitted at the instance of a defendant who is seeking to *justify* his acts on account of such threats. To justify—to entirely exonerate a party for a homicide committed on account of threats, it must be shown that deceased not only made the threats, but that he actually did some act manifesting at the time he was killed an intention to execute his threat.   In other words, to *justify* homicide an overt act evincing an intent or purpose to carry out his threat must be established.   But, where a defendant does not claim complete justification, but seeks only to show the standpoint from which he acted, are not such threats admissible to throw light upon his act and mitigate his offense?   There is certainly nothing in the language of the statute quoted which denies him such right; the language is that threats made, accompanied by acts, "shall not be regarded *as affording a justification*."   Therefore, though not in justification, they may neverthless be admissible as evidence,—as to their effect as evidence, that is another question. They may not justify, and still they may *mitigate* the offense.

In Horbach's case, 43 Texas, 259, Roberts, C. J., says:   "By our code threats are admissible as independent evidence, without having first established a predicate for their admission by proof of acts done at the time of the killing to which they might give additional force, subject to having their effect as evidence subsequently explained away and destroyed by the charge of the court in the absence of evidence tending to prove such acts." In the State v. McNeely, 34 La., 1022, it was held that on a trial on a charge of murder the accused has the right to show and prove previous threats against him, and the dangerous character of the deceased, as evidence tending to rebut the presumption of malice and to mitigate the offense charged.

We are not aware of any decision of the Supreme Court or of this court going to the extent of holding that evidence of threats was not admissible, simply because no predicate had been laid for their introduction by proof of an overt act of the injured party.   In the cases cited by counsel for the State, except the case of Penland, 19 Texas Court of Appeals, 365, evidence of the threats had been admitted, and it was the legitimate effect attaching to

them as evidence, and not their admissibility, which was under discussion. In Penland's case the defense was justifiable homicide in self defense, and the refusal to permit evidence of the previous threats is discussed with reference to that defense, and it is held that the ruling could not possibly have injured defendant, since his defense was wholly without the slightest shadow of foundation in law upon the facts developed. (See Allen v. The State, 17 Texas Ct. App., 637.) This question of threats will be found to have been discussed in the following decisions of the Court of Appeals, viz: Sims v. The State, 9 Texas Court of Appeals, 586; Russell v. The State, 11 Texas Court of Appeals, 288; Thomas v. The State, Id., 315; Logan v. The State, 17 Texas Court of Appeals, 50; Allen v. The State, Id., 637; Penland v. The State, 19 Texas Court of Appeals, 365; Patillo v. The State, 22 Texas Court of Appeals, 586.

From all the authorities we are of opinion the true doctrine is that threats are ordinarily *per se* admissible as independent evidence in cases of this character. But, as to how far they will justify or mitigate a crime, we believe the correct rule is that announced by Moore, J., in Johnson v. The State, 27 Texas, 757. He says: "If at the time of the homicide there is any act from which the accused may reasonably infer an intention to carry them into effect, he is justified in resorting to such means as may then be in his power to defend and protect himself against their execution. If death ensues, it is justifiable homicide. But in no case, under the provisions of the code or out of it, if we are permitted to look elsewhere to ascertain the law upon the subject, can it be held that mere threats, or threats unaccompanied by some demonstration from which the accused may reasonably infer the intention of their execution by the deceased, either justify such homicide or reduce it from murder to manslaughter." As thus announced, the rule has been reaffirmed in Irvin v. The State, 43 Texas, 236, and Sims v. The State, 9 Texas Court of Appeals, 586. So that whilst threats are *per se* admissible, they can neither *justify* nor *mitigate* unless there was at the time some demonstration or act from which the accused might reasonably infer an intention to execute them.

Now let us apply these principles to the case in hand. The excluded evidence was admissible, and the court committed an error in excluding it. If the evidence was material, that is, if the excluded evidence would have been supplemented and emphasized by other evidence of an overt act or demonstration at

the time by Russell, then the error becomes material and reversible error. It is not essential that the overt act or demonstration be sufficient to justify or raise the issue of self defense, but if in connection with other antecedent facts and circumstances, it was sufficient to excite, in the mind of a person of ordinary temper, sudden passion, rendering it incapable of cool reflection, then adequate cause would be produced sufficient to raise the issue of manslaughter, and the law of manslaughter would be the law of the case.

It is in evidence that Russell, as he passed, checked up and looked into the window of appellant's house, and his manner was so significant as to attract the attention of witness; that, when appellant came out of his house, he did not immediately present his gun at Russell. A voice called out in an elevated tone, "Don't do that, Howard." Doubtless Russell, hearing this, turned to see what was the occasion of it. At all events, Hanley, a witness for the defendant, says that he, Russell, turned, facing appellant, and ran his right hand under his coat, and that this was done before appellant presented his gun and fired. Now, if Hanley tells the truth, here was clearly a demonstration on the part of Russell which, in connection with the previous threats, might have aroused in the mind of defendant a sudden passion of anger, terror, etc., sufficient to render it incapable of cool reflection, and from which a jury might have found manslaughter instead of murder, had death ensued from the shooting. (Neyland v. The State, 13 Texas Ct. App., 537; Hobbs v. The State, 15 Texas Ct. App., 517; Miles v. The State, 18 Texas Ct. App., 156; Wadlington v. The State, 19 Texas Ct. App., 266.) It will not do to say that Hanley's testimony on this point is uncorroborated, and, therefore, probably untrue. That was matter for the jury, and not for the court to determine. It is the duty of the court to instruct the jury upon every phase of case suggested by the proof, however slight may be the testimony supporting it. (Hobbs v. The State, 16 Texas Ct. App., 517.)

But it is contended that defendant came out of his house with his gun in his hands, and for the purpose of provoking the contest, and with apparent intention of killing or doing serious bodily injury to Russell; and that, in consequence, his offense under our statute could not come within the definition of manslaughter. (Penal Code, art. 603.) We reply that his motive in coming out of the house with gun in hand was a fact to be found by the jury.

But, again, it may be contended that appellant's having fired the second shot when his enemy was retreating, and he himself no longer in any apparent, much less real danger, he had carried his right to act on demonstrations and appearances too far, and had death resulted from the second shot, his crime could not have been of less grade than murder. Discussing an analogous question in Hobbs's case, 16 Texas Court of Appeals, page 523, Judge Willson says: "But suppose he became excited by passion to such an extent as to render his mind incapable of cool reflection, and under this state of excitement he carried his right of self defense too far, used more force than was necessary to his protection, fired one or more shots after all real or apparent danger had ceased, but before his mind had had time to cool, and from wounds thus inflicted death had resulted, would this have been murder? We think not. * * * We think a homicide under these circumstances would not be of a higher grade than manslaughter." (See also 35 Mich., 16.)

Recurring back to the original proposition, that manslaughter was part of the law which should have been given in charge to the jury, it may also be well to call attention to the rule announced in Miles's case, 18 Texas Court of Appeals, 170, to the effect that while it is true that the provocation must arise at the time of the commission of the offense, and the passion must not be the result of a former provocation, yet, in passing upon the sufficiency of the provocation, and on the effect of the passion upon the mind of the defendant, the past conduct of deceased towards defendant, his threats and bearing, in fact all the facts and circumstances in the case should be considered by the jury. An act standing alone may not be sufficient provocation, but may be ample when it is one of a series of similar acts, or when it has been preceded by an insolent and aggravating course of conduct, whether similar or not to the act committed at the time of the homicide. (Waddington v. The State, 19 Texas Ct. App., 266.)

We are of opinion that the court erred in excluding the evidence of the antecedent acts, conduct and threats of Russell towards and against appellant; and that the court erred to the injury of defendant's rights in failing and refusing to give in charge to the jury the law of manslaughter as applicable to the case. And for these errors the judgment is reversed and the cause remanded for another trial.      *Reversed and remanded.*