A. D. Smith v. The State.

No. 4032. Decided April 5, 1916.

Rehearing denied May 3, 1916.

1.—Murder—Manslaughter—Defense of Person and Property—Charge of Court.

Where, upon trial of murder and a conviction for manslaughter, the testimony did not raise the issue of the right to kill in defense of property, and much less defense of the person of defendant, the contention that the court should have submitted a charge on defense of defendant's person was untenable, and there was no reversible error, the court having submitted a charge on defense of property.

**2.—Same—Charge of Court—Murder.**

Where defendant was convicted of manslaughter, his objections to the court's charge on the issue of murder need not be considered on appeal.

**3.—Same—Manslaughter—Charge of Court—Burden of Proof.**

Where, upon trial of murder, the court's charge on manslaughter was not subject to the criticism in defendant's bill of exceptions in that it did not reverse the rule on the burden of proof, there was no reversible error. Following Hendricks v. State, 69 Texas Crim. Rep., 209.

**4.—Same—Charge of Court—Defense of Property.**

Where, upon trial of murder, the court submitted a requested charge by the state to the effect that if the jury found beyond a reasonable doubt, etc., that if defendant killed deceased in the execution of a previously formed intent, etc., and not in defense of his property, etc., such killing would not be justifiable, there was no reversible error as the evidence raised such an issue.

**5.—Same—Requested Charges.**

Upon trial of murder, there was no error in the court's refusal to submit defendant's requested charges upon issues which were not raised by the evidence, or upon issues which the court's main charge had submitted.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of manslaughter; penalty, not less than two nor more than five years imprisonment in the penitentiary.

The opinion states the case.

*Taylor & Taylor* and *Farmer & Farmer,* for appellant.—On question of court's charge and insufficiency of the evidence: Ledbetter v. State, 26 Texas Crim. App., 22; Hill v. State, 10 id., 618; Price v. State, 22 id., 392; Ball v. State, 29 id., 107; Woodring v. State, 33 Texas Crim. Rep., 26; Jackson v. State, 180 S. W. Rep., 259.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of self-defense and defense of property: Driver v. State, 65 S. W. Rep., 528; Sims v. State, 38 id., 637; Woodring v. State, 33 id., 26.

HARPER, JUDGE.—Appellant was indicted, charged with murder, and when tried he was convicted of manslaughter, from which judgment he prosecutes an appeal to this court.

The court submitted defense of property, but appellant also earnestly insists that the court should have charged on defense of his person, and that he committed error in not so doing. If the issue is raised by the testimony, appellant properly presents the question by showing that he excepted to the charge because of the failure to so instruct the jury, and he prepared and asked special charges on that issue.

The evidence would show that appellant rented a farm from J. B. Burns that was supposed to contain one hundred and sixty acres of land in cultivation. Appellant, with the consent of the landlord, sublet a portion of the farm to deceased, G. W. Campbell. Over the terms of

this rental contract the first trouble arose. Appellant contended that he sublet to Campbell all the land except sixty acres, he retaining that specific number of acres. Campbell contended that he specifically rented one hundred acres, appellant reserving the remainder. There was not one hundred and sixty acres of land in cultivation, and appellant was contending for his sixty acres and deceased for his one hundred acres. Considerable feeling was manifest, but Mr. Burns visited the farm and the matter was adjusted. There was a small house near the residence of appellant, and on the land he was cultivating. At one time there was an agreement that deceased was to be permitted to move this house to the land he was cultivating, he having the most land. Appellant, Mr. Burns and deceased agreeing to this. However, after the adjustment of the land troubles, appellant, on the way to town, told Mr. Burns he did not want to let deceased have this small house, and Mr. Burns then told appellant it was all right with him, and to tell the deceased he said not to move the house. Deceased was not made aware of this change of plans until the morning of the homicide. Deceased secured his brother, J. A. Campbell, and E. W. Dalrymple to assist him in moving the house. Dalrymple and J. A. Campbell say when they got to appellant's, Dalrymple got out of the wagon to open the gate, and as he did so appellant came out and said: " 'Campbell, I went down there and investigated that business,' and says, 'You had better not come in the yard and move that house.' He (Campbell) says, 'How is that, Smith? Don't you know that has been our contract and trade all the time?' And he says, 'Yes, I know it has, but I talked to Mr. Burns, and Mr. Burns told me to tell you to leave the house alone,' and Campbell says, 'Why didn't you get an order from Mr. Burns and tell him to tell me to leave the house there?' and he says, 'You know I wouldn't believe any such talk as that,' and Mr. Smith says, 'Well, I didn't think I needed it,' and says, 'You had better go call in the law to move the house,' and 'Mr. Burns told me to tell you to leave it alone.' Then Campbell says, 'All right, Mr. Smith,' says 'I don't believe that, not a damn word do I believe.' And Mr. Campbell at that time was sitting on the end of the seat with his feet out on the wheel and Mr. Campbell just got out and went on around the front of the team, and when he got out Mr. Smith says, 'Well,' says, 'All right,' and he just wheeled and went back in the house and just jerked the door open, and I saw Mr. Campbell sorter break—sorter go walking off right fast, and about that time Mr. Smith just ran out with a shotgun and just as Mr. Campbell looked around why he shot him with a shotgun and he just fell over, staggered over yonder-way, and before he could get straight again he shot him again in the back and he fell over that way and was trying to get behind the wood pile the last shot. He just taken the gun in his left hand and just drawed his pistol this way and just shot him before he ever hardly got straight."

It will readily be seen by this testimony that the right to kill in defense of property is not even raised, much less defense of his person, for the witnesses show that deceased was unarmed, made no demon-

stration, and was nowhere near appellant, nor near the little house. The only other eyewitness to the transaction was appellant, and we must look to his testimony to see if defense of his person is raised by his testimony. On direct examination he testified: "I saw Mr. Campbell and his brother and Mr. Dalrymple in the wagon coming to move this house and when they got to the gate about thirty or forty steps from my house I saw what they had in his wagon and what the consequences was and I slipped a couple of shells in my shotgun, reached up in a little closet and got my pistol and put it in my pocket, and as Campbell drove up in the yard and stopped by this little house I spoke to him and told him, 'Mr. Campbell, you are not going to move that house. I went to Waco last night and consulted with the attorney and talked to Mr. Burns and he said to tell you that he strictly forbid you a moving that house; that you would have to go strictly according to law.' He said, 'I wouldn't believe a damn word that you say. I believe you are telling a damn lie.' As he started out of the wagon, I says, 'Campbell, don't you get out of that wagon in my yard.' I saw that he was getting out anyway. I made for my gun. As I come back out with my gun, Campbell had walked up within three or four feet of the back of this shed and there was a plank lying there nailed to two posts, and Campbell was stooping over in the act of taking hold of this plank—he had his right side turned towards me. I said, 'Campbell,' and as he wheeled around, why I shot him. The first time I shot him he whirled back the other way and I let him have the other barrel and he still didn't fall and I reached and jerked my sixshooter and shot him as quick as I could with that, and he fell some eight or ten feet from where I shot him the last time in a stumbling, falling position.

"When I fired the shot I was kinder excited and mad, too. When Mr. Campbell got out of his wagon I feared an attack on my person. I thought that he had come there for trouble, and I had forbidden him coming in the yard and when I saw him coming I thought he was coming for trouble.

"I thought it was necessary for me to shoot Mr. Campbell in defense of my property. I was afraid of him otherwise. I had forbidden him moving the house and told him that he wasn't going to move it and I was afraid to interfere without doing just what I did do."

This is all his testimony on direct examination. On cross-examination he testified: "Q. Why did you shoot Mr. Campbell? A. Well, as I said a while ago, I had objected to him moving the house and didn't intend for him to move it without a legal right to do so, and I was afraid to interfere with it. He (Campbell) had the material to move the house with. Yes, sir; it was in his wagon. No, sir; he hadn't put any of those tools out on the ground; I didn't give him time. No, sir; at the time I shot him he had no tool in his hand, as I saw. Q. Why didn't you say to him, that you didn't want the house moved? A. I was afraid to give him any chance. Q. Well, he was thirty feet from you? A. I didn't know but what he was armed. . . . I did not have my gun presented. No, I hadn't seen any arms and he had

not made any attack on me. He had not put any blocks or rope or anything around the house to move it or prize it up on its pillars. Q. Well, why didn't you argue the matter with him a little with the shotgun in your hand before you shot him? A. I was afraid to wait any longer. I didn't know but what he was armed and would get the drop on me. Yes, sir, it was my purpose to kill him after firing the first shot. That is what I shot at him for. Q. Didn't you think after the firing of the first shot that he was going to leave? Did he turn in the direction to get away? A. I was afraid to quit; afraid to let him get away. I never saw him make any effort to do any shooting after I fired the first shot. I didn't say anything to him except what I have told the jury, that is, argue with him, or use any other means except what I have stated here to prevent him moving the house. No, sir; I didn't see any gun in the wagon. I never looked in the wagon. I never went any closer to the wagon, I don't suppose, than thirty feet, twenty or thirty feet, about the same distance from the wagon that I was from him. Yes, sir; I was mad, too. It made me mad when he drove up there and give me the damn lie and said he wouldn't believe a damn word I said and believed I was telling a damn lie. No, sir, he hadn't threatened me that morning there."

This testimony, we think, demonstrates that deceased had made no demonstration of any character to do appellant any harm personally. He says he shot him "because he was afraid deceased might do something," not that he had done anything or had said anything, or made any demonstration that would lead one to believe he was in any danger of death or serious bodily injury. As said by Mr. Branch in his work on Criminal Law, section 462: "Not error to fail or refuse to charge on self-defense, although threats of the deceased are in evidence, if there is no evidence that at the time defendant killed him, deceased was doing any act manifesting an intention to execute the threats," citing Allen v. State, 17 Texas Crim. App., 637; Penland v. State, 19 Texas Crim. App., 365; Lynch v. State, 24 Texas Crim. App., 350; Irwin v. State, 43 Texas, 236.

The only evidence of anything done on that occasion, even from appellant's standpoint, is that deceased got out of his wagon, and from his acts and conduct led him to believe that deceased was going to move or attempt to move the little house, without the consent and against the will of appellant, and this issue was fully presented by the court in the charge on the right to defend his property. We agree with appellant in his contention that where the evidence had the least tendency to bring the case under the provisions of both articles 675 and 677, it is incumbent upon the court to charge the law governing both such defenses, and they must be stated distinctly and not be blended together. But in this case there is not a particle of testimony tending to raise any other issue, as shown above, than the defense of property. There is no evidence that appellant personally was ever in real or apparent danger,—he only stating that he feared, if he did not kill deceased, he might thereafter do something,—not that he was then

doing anything to lead him to believe he was in danger of taking his life or suffering serious bodily injury.

The next bill of exceptions complains of the paragraph of the charge submitting the issue of murder. As appellant was acquitted of that offense, there is no necessity of discussing that paragraph of the charge. The paragraph on manslaughter is not subject to the criticisms contained in the third bill of exceptions. It does not reverse the burden of proof as contended by appellant. (Hendricks v. State, 69 Texas Crim. Rep., 209, 154 S. W. Rep., 1005.) And the fact that it "ignores the right of defendant to defend himself against an unlawful attack on his person," is not error, as the evidence raises no such issue.

The only other bill of exceptions in the record complains of the action of the court in giving a special charge requested by the State, that "if the jury found beyond a reasonable doubt, under the evidence, that appellant killed deceased in the execution of a previously formed intent or plan to take his life, and not in defense of his property under the law, such killing would not be justifiable," etc. There is evidence raising such an issue, and the State is entitled to have its theory presented as well as that of defendant. Appellant himself testified to getting his pistol and putting it in his pocket, and loading his gun and setting it in convenient reach when he saw deceased approaching. He is thus shown to have gotten ready to kill on sight of deceased, and the State's testimony is that deceased had done nothing more than get out of his wagon and start around the wagon, telling appellant he did not believe that Mr. Burns said for him not to move the house, when appellant rushed in the house, got his gun and shot deceased. As Mr. Dalrymple puts it: "Mr. Smith came out of the house like a tiger. He just rushed out of the house with a gun and fired. Mr. Campbell looked like he was fixing to leave—he was going away from the house in a pretty fast walk, but Mr. Smith just throwed a load of shot into him. Campbell (deceased) did not have anything in his hands when he got out of the wagon or when appellant shot him. The first shot entered the side, and the last two struck deceased in the back."

The court gave appellant's special charge No. 1. Special charges Nos. 2 and 3 relate to defense of his person from an unlawful attack, and of course there was no error in refusing such instructions, the evidence raising no such issue. There is no evidence of any attack or assault of any character in this case. The most the evidence would raise was that deceased, or it might so appear to appellant, was getting ready to attempt to move the house.

The court does charge that appellant was in legal possession of the house, therefore there was no necessity to give charge No. 4 requested, and as appellant was found not guilty of murder, special charge No. 5 relating to that offense need not be discussed.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied May 3, 1916.—Reporter.]